Madden, Judge,
delivered the opinion of the court.
The plaintiff bases its claim upon Section 17 of the Contract Settlement Act of 1944, 58 Stat. 649, 665, 41 U. S. C. 117. We quote the section in a footnote.[1] Section 113 re *116 ferred to in paragraph (c) authorizes a contractor, who is dissatisfied with the settlement offered him by the contracting agency, to appeal to the Contract Settlement Appeal Board, and, if he is dissatisfied with the action of the Appeal Board, to bring suit in this Court.
The plaintiff had a contract with the Army Ordnance Department for the manufacture of a quantity of 105 millimeter M60 chemical shells at a fixed unit price per shell during 1944 and 1945. Under the contract, certain equipment and materials needed for the manufacture of the shells were to be furnished by the Government and others were to be secured by the plaintiff under priority ratings. Article 5 of the contract, as shown in our Finding 2, defines as “excusable delay” in the performance of the contract by the plaintiff any delay due to causes beyond the control of the contractor, expressly including acts of the Government, priorities, and delays of subcontractors.
On December 5, 1944, the Philadelphia Ordnance District advised the plaintiff that the shells it was manufacturing were extremely critical. It wrote “all-out production is required. This means that nothing should be spared in the way of hours or effort to obtain the desired results.” The same request had been made orally by Government representatives in November. After the oral request the plaintiff changed its working schedule from two ten-hour shifts six days a week to two twelve hour shifts seven days a week. This increased its wage costs because all of the extra time was overtime, payable at time and one-half, except the Sunday time which was payable at double time. The additional cost to the plaintiff of this overtime was $12,848.64.
Under the contract the Government was to have furnished a furnace for the heat treating of the shells. It was late in furnishing the furnace and the plaintiff had to send some of the shells out to be heat treated at another plant, at an additional cost to it of $9,309.62. The plaintiff’s subcontractors could not secure the necessary steel to make the adaptors for the shells, and the plaintiff bought a special die, at a cost of $1,400, so that the steel which it could obtain could be worked into adaptors. Because it did not have priorities to purchase steel at steel mills, it bought steel from *117 warehouses at prices $1,286.04 above mill prices. Because it could not get the proper adaptors, it converted, with the consent of the Government, adaptors for 155-mm shells for use in the 105-mm shells by reworking them at a cost of $1,292.40. The forging equipment of one of the plaintiff’s subcontractors broke down and the plaintiff had the steel on hand in that subcontractor’s plant transferred to another plant, at a cost of $951.97. The plaintiff’s agents made many trips in search for special sources of materials to keep the work on the shells going. The cost of these trips to the plaintiff was $2,742.57.
The plaintiff, having done the things which we have recited in order to produce the shells as rapidly as possible, requested payment for these expenses, and some other items hereinafter referred to, basing its claim on Section 17 of the Contract Settlement Act of 1944. On October 23, 1947, the contracting officer denied the plaintiff’s request on the grounds the plaintiff did not furnish materials, services, or facilities without a formal contract nor did it furnish materials, services, or facilities over and above that which it was obligated to do by the contract, i. e., to complete the work within the contract time. The plaintiff appealed from the decision of the contracting officer to the Contract Settlement Appeal Board. That Board rendered an opinion in which it said, in part:
Appellant has convinced us that the Ordnance Department requested it to make extraordinary efforts, outside of those required under its contract, to expedite the completion of the shells, and that the request was made under such circumstances as to constitute a commitment by the Government to pay the excess cost arising out of compliance with the request, within the rule stated in the Board’s decisions on the subject.
But the Board allowed the plaintiff only $96.92, the expense of two minor trips.
We think the Appeal Board was right in concluding that the plaintiff had a claim under Section 17 of the Contract Settlement Act, but was wrong in denying substantially all the items claimed by the plaintiff. The plaintiff, under the terms of its contract, was not obligated to make any of the *118 expenditures which, we have recited. If the delivery of shells had been delayed, it would have been because the Government did not furnish the heat-treating furnace which it had agreed to furnish, steel could not be obtained in the normal market because of lack of priorities, and subcontractors were, in default in making deliveries to the plaintiff. Each of these things was, in the plaintiff’s contract, expressly made a “valid excuse” to the plaintiff for delayed performance. At the urging of the Government, the plaintiff took extraordinary — and to it very costly — measures to surmount the obstacles to prompt performance. /The Government’s urging, and the steps taken pursuant to it, created, as the Appeal Board said, “a commitment by the Government to pay the excess cost arising out of compliance with the request.” As such it came within the text and the spirit of Section 17y'
The- plaintiff claims some $20,000 as an extra cost occasioned by the inefficiency of its labor during the time that it was working a twelve-hour ■ day and a seven-day week. The evidence shows that the shells manufactured during the last three months of this period cost $7.5534 each, while those manufactured in the period immediately following, under the same conditions except that the workday was reduced to ten hours and the workweek to six days, cost only $5.918 each. Applying this ratio of loss of efficiency to all the shells manufactured during the period of the long workday and week, the plaintiff’s loss due to lack of efficiency of labor would be $30,152.95. There are, however, elements of uncertainty in the problem.
The plaintiff’s computation of increased unit cost due to inefficiency of its labor is made from figures giving total costs, not merely labor costs, for the two periods compared. If the costs of materials were the same during the two periods, the inclusion of the material costs in the computation would work to the plaintiff’s disadvantage, since its inclusion would dilute, percentagewise, the difference in the labor costs. On the- other hand, if materials cost more during the high-cost period, that would account for all or some of the difference, and would create doubt as to whether the labor costs were higher, and if so, how much. In addition, *119 it seems probable that the costs incurred during the high-cost period of February, March, and April, which period was used as the measuring period, included the cost of a good deal of material in process at the end of the period, and of work done on that material, which, because the shells so in process were not delivered during the period, increased the unit cost of the shells delivered during the period. There was probably not much work in process at the end of the May, June, July period, the low-cost period, since the contract work was being closed out at the end of July.
On the other hand, we judicially recognize that efficiency would be impaired by working a twelve-hour day and a seven-day week. A Government study introduced in evidence showed that in the case studied, efficiency was reduced by some 20% by extending the working day to ten hours and the week to six days. The Government’s auditor had an opportunity to study the plaintiff’s computation, which was set forth in its petition, and to advise us whether the figures were vulnerable in the respects which we have suggested.
In spite of the lack of certainty in the plaintiff’s evidence, we are convinced that it did incur increased costs due to inefficiency of labor, resulting from extending the workday and workweek, in amount not less than half the $30,152.95 which its computation, when properly adjusted, purports to show. We, therefore, award it $15,076.47 on this item.
The plaintiff had recoverable excess costs of $44,234.78. After deducting the $96.92 which was allowed by the Appeal Board, it is entitled to a judgment for $44,137.86.
It is so ordered.
Howell, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.

 117. (a) Where any person has arranged to furnish or furnished to a contracting agency or to a war contractor any materials, services, or facilities related to the prosecution of the war, without a formal contract, relying in good faith upon the apparent authority of an officer or agent of a contracting agency, written or oral instructions, or any other request to proceed from a contracting agency, the contracting agency shall pay such person fair compensation therefor.
(b) Whenever any formal or technical defect or omission in any prime contract, or in any grant of authority to an officer or agent of a contracting agency who ordered any materials, services, and facilities might invalidate the contract or commitment, the contracting agency (1) shall not take advantage of such defect or omission; (2) shall amend, confirm, or ratify such contract or commitment without consideration in order to cure such defect or omission; and (3) shall make a fair settlement of any obligation thereby created or incurred by such agency, whether expressed or implied, in fact or in law, or in the nature of an implied or .quasi contract.
(c) Where a contracting agency fails to settle, by agreement, any claim asserted under this section, the dispute shall be subject to the provisions of section 113 of this title.