**J. G. WATTS CONSTRUCTION COMPANY**
v.
**The UNITED STATES.**
No. 148–56.

United States Court of Claims.
Jan. 21, 1966.

Lewis K. Scott, Portland, Or., for plaintiff; William F. Lubersky, Portland, Or., attorney of record; Koerner, Young, McColloch & Dezendorf, Portland, Or., of counsel.

Mary J. Turner, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant. Mary K. Fagan, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

COLLINS, Judge.

In 1952, the Bureau of Public Roads, Department of Commerce, awarded to plaintiff a contract for the construction of approximately 4.3 miles of road in the Umpqua National Forest, Oregon. The road was completed by plaintiff and was accepted by the Bureau of Public Roads in December 1953. The basis for the present suit is plaintiff's charge that the Government breached certain contractual obligations. Plaintiff seeks to recover excess costs allegedly incurred as a result of negligence on the part of the Bureau of Public Roads personnel who set the stakes which governed construction of the road.

The facts may be summarized as follows: The road was built along the North Umpqua River in an area which was rough and mountainous. Plaintiff's work included the removal of soil, blasting through rock, use of earthmoving equipment to achieve subgrade, and finishing with a layer of "cushion" material. Stakes set by the Bureau of Public Roads provided the guidance for plaintiff's excavation. For example, center-line stakes, which were placed at intervals of no more than 50 feet, indicated the location of the middle of the prospective road. Each such stake contained data regarding the elevation of the subgrade at the particular point. Related functions were served by reference and slope stakes; these are explained in finding 6. Construction at a given location could not begin until the appropriate stakes had been set. Center-line stakes were destroyed during normal construction, but many of the slope and reference stakes remained.

The roadbed was divided into stations at 100-foot intervals. Plaintiff's basic plan was to commence operations at Williams Creek (station 794) and then work eastward. Upon reaching the eastern end of the project (station 875), plaintiff would return to Williams Creek and then proceed to the western terminus (station 654). Construction was started in the Williams Creek area in May 1952.

While performing the earlier stages of the excavation process, plaintiff's crews encountered no unusual problems. However, in certain locations, serious difficulties arose as the rough grading approached the subgrade. For example, during the spring of 1953, there were instances in which undulations appeared as the road surface came near the subgrade level indicated on the slope and reference stakes. In the latter part of April 1953, plaintiff replaced its job superintendent. However, neither this step nor other changes in personnel succeeded in eliminating the difficulty regarding subgrade fluctuations.

On a number of occasions, the new superintendent called in plaintiff's engineer, Clarence W. Chellquist. Mr. Chellquist checked the stakes in the specific areas and determined that errors were present. Finally (in May or June of 1953), Mr. Chellquist was relieved of his other duties and was directed to devote all of his time to the checking and correction of stakes. At first, Chellquist worked just ahead of plaintiff's excavating crew. Then, by July 1953, he began a resurvey of all stakes remaining over the entire project. The survey, which indicated numerous substantial errors in the slope and reference stakes, was submitted to the Bureau of Public Roads in the fall of 1953. The Bureau acknowledged that plaintiff's survey was substantially correct. (See finding 8.)

In the meanwhile, the grading operation had been completed. During the remaining months, plaintiff was involved in the process of finishing. As stated

above, plaintiff's work was accepted by the Bureau on December 2, 1953.

The contract consisted of a number of different pay items or types of work, the largest of which, unclassified excavation, is the subject of the present suit. Payments to plaintiff were based upon estimated quantities. Thus, for each cubic yard of unclassified excavation, plaintiff was entitled to 90 cents. The final estimate, dated January 31, 1957, shows payments to plaintiff of $485,969.47 for all work under the contract. In addition, plaintiff submitted a claim to the contracting officer for an equitable adjustment. The contracting officer made allowances totaling $5,999.09. On January 14, 1959, the Appeals Board for the Department of Commerce held that plaintiff was not entitled to any equitable adjustment beyond that awarded by the contracting officer.

In the present action, plaintiff seeks not an equitable adjustment, but damages for breach of the contract. According to plaintiff, the various staking errors caused increases in plaintiff's costs to the extent of $130,228. Defendant denies that plaintiff is entitled to any recovery.

Commissioner Mastin G. White, to whom this case was referred, accepted the view that plaintiff had been injured as a result of the Bureau's errors in staking. Commissioner White found that plaintiff's damages amounted to $35,985. We are largely in agreement with the report of the commissioner.

Before discussing the question of negligence on the part of the Bureau of Public Roads, consideration must be given to defendant's assertion regarding finality of the administrative decision. According to defendant, since plaintiff has failed to prove or even allege that the determination of the Department of Commerce Appeals Board was arbitrary or unsupported, plaintiff cannot recover in this action. A sufficient answer to defendant's argument is contained in the opinion of the Appeals Board.

 In accord with a request by plaintiff, the Board included in its opinion the following:

* * * the Board hereby states that it is passing only on the administrative claim for equitable adjustments, and is excluding from its consideration questions relating to award of damages for breach of contract.

The Board will limit its consideration to the claims for equitable adjustments under the contract, at the contract rate, for additional work caused the Contractor by the Bureau * * *.

Thus, the Appeals Board expressly recognized the distinction between plaintiff's administrative claims and plaintiff's action for breach of contract. Under these circumstances, the decision of the Appeals Board is not a bar to recovery by plaintiff in this suit. Cf. Ekco Products Co. v. United States, 312 F.2d 768, 160 Ct.Cl. 75, 84 (1963). Plaintiff has consistently asserted that its claim for unliquidated damages could not be determined administratively. For this reason, there is no basis for applying to plaintiff the doctrine of estoppel which was utilized in H. R. Henderson & Co. v. United States, 169 Ct.Cl. 228, 245 (1965).

 There is another argument of defendant which appears to overlook the nature of plaintiff's present claim. Defendant emphasizes that contractual provisions "clearly contemplated * * * that changes, adjustments, and modifications in the alignment, grades, quantities, and slopes would become necessary as conditions developed in the field during layout and construction." Defendant's argument fails to recognize (1) that plaintiff has not challenged the right of the Bureau to effect changes in the plans for the road and (2) that plaintiff is not now seeking compensation for additional quantities of excavation. The theory of the present action is that the excavation which plaintiff accomplished (and for which plaintiff has been paid the contract rate) was rendered more costly as a result of the improper staking. We share plaintiff's view that the Bureau did not have a contractual right to supply incorrect and misleading stakes.

## EXCAVATION PRIOR TO THE FINISHING STAGE

Commissioner White found that the slope and reference stakes placed by the Government were not within reasonable limits of engineering accuracy. This finding (number 8) is supported by the evidence, specifically by the testimony of plaintiff's expert witnesses. The parties disagree as to the precise standard of accuracy which was applicable to the staking. Defendant contends that a variance of 1 foot (too high or too low) would be reasonable, while plaintiff asserts that the proper limit was no more than three-tenths of a foot. Complete acceptance of plaintiff's assertion is unnecessary, for, even under the standard proposed by defendant, a substantial portion of the stakes (resurveyed by Chellquist) was in error. Furthermore, a tolerance of plus or minus five-tenths of a foot would appear to be reasonable, and, according to the Chellquist survey, 51 percent of the slope and reference stakes exceeded this limit of vertical tolerance. Thus, whatever the precise standard for staking accuracy, an excessive number of errors was committed by the Bureau of Public Roads. It is important to note that, after the making of various corrections, the Bureau admitted the validity of Chellquist's survey.

The contract imposed upon the Government the obligation to "set construction stakes establishing lines, slopes and continuous profile-grade in road work * * *" and further provided that "[such stakes] * * * shall constitute the field control by and in accordance with which the contractor shall govern and execute the work." In order to satisfy its contractual duty, it was incumbent upon the Government to perform in a reasonable and workmanlike manner. Otherwise, the Government would run afoul of the implied condition that neither party hinder the work of the other. Cf. Laburnum Constr. Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339, 350 (1963). As indicated above, the Bureau of Public Roads failed to observe reasonable standards of accuracy.

In order to prevail, plaintiff must show not only that errors were committed, but also that damage resulted. Commissioner White found that the negligent staking had a substantial and adverse effect upon the efficiency of plaintiff's operations. A general description of the consequences of the errors is contained in finding 11. One area in which plaintiff experienced difficulty was that between Williams Creek (station 794) and station 720. Excavation of this region took place in March and April 1953. According to plaintiff's witnesses, numerous interruptions occurred during this period. One such instance occurred just west of Williams Creek. The irregular nature of the grade (which had been based upon the stakes set by the Bureau) necessitated the cessation and then the retracing of operations. As a result, the efficiency of plaintiff's work was reduced. It is this type of injury for which plaintiff seeks compensation.

Defendant contends that plaintiff failed to give the Bureau timely notice of the inaccurate staking and that, therefore, plaintiff's position is that of a contractor who, with knowledge of discrepancies, seeks to take advantage of them. Defendant cites such cases as Beacon Constr. Co. of Mass. v. United States, 314 F.2d 501, 161 Ct.Cl. 1 (1963). There are two flaws in defendant's analysis. First, plaintiff itself was slow to realize that a cause of its difficulties was erroneous staking. Until late April 1953, plaintiff had assumed that the inefficiencies could be remedied by making changes in personnel. By the latter part of April, the process of basic excavation had been completed over much of the road. Secondly, defendant's resident engineer was present at the work site, and plaintiff was reasonably prompt in informing him of the matter of erroneous stakes.[1] In any event, defendant is not correct in

---

1. The exact date when Mr. Chellquist related his general suspicion regarding stakes to the Bureau's resident engineer is not clear. However, this appears to have occurred in May or early June of 1953.

asserting that plaintiff began its survey in July 1953 without having apprised the Bureau of the alleged errors. The Government had been told previously of plaintiff's suspicions regarding the staking.

Much of defendant's argument consists of an effort to show, through the recitation of specific occurrences, that plaintiff itself was inefficient or that plaintiff did not actually follow the stakes placed by the Bureau. In this manner, defendant seeks to demonstrate that plaintiff is not entitled to recover. Some of the particular points raised by defendant are valid, and it does appear that plaintiff's theory of recovery attributes insufficient weight to factors for which plaintiff must bear responsibility. Nonetheless, the acceptance of certain of defendant's allegations does not mean that plaintiff's claim must be denied in its entirety. To the contrary, we have adopted the view of Commissioner White that plaintiff is entitled to some recovery. In determining the amount of plaintiff's award, however, an attempt must be made to give adequate weight to the charges of defendant regarding plaintiff's performance.

Defendant cites Palumbo v. United States, 113 F.Supp. 450, 125 Ct.Cl. 678 (1953), a suit based upon a contract for the grading and conditioning of an airport. There is a limited degree of similarity between claims of Palumbo and the subject of the present suit. For example, Palumbo asserted that, because of erroneous bench marks set by the Government, he was required to regrade a runway area. This claim and the others of Palumbo were denied. 113 F.Supp. 450, 125 Ct.Cl. at 685, 690. As is true of the present case, the primary issues in Palumbo v. United States were factual ones. Palumbo was unable to prove the existence of a valid claim, but, in the present case, the record is such that recovery by plaintiff is warranted.

## THE MATTER OF FINISHING

A major part of plaintiff's claim is based upon alleged "refinishing" caused by the Bureau's staking. Commissioner White made no findings in support of this portion of plaintiff's claim. However, he did reach the following conclusion:

> * * * The plaintiff alleges that it was required to do a substantial amount of refinishing work because of negligent errors made by personnel of the defendant in setting blue tops to guide the plaintiff in finishing the road. * * * This allegation is not sustained by a preponderance of the evidence.[2]

Plaintiff contends that the commissioner misstated its position. Plaintiff's current explanation of its argument, as stated on page 73 of Plaintiff's Exceptions to the Commissioner's Report, is as follows:

> * * * The extensive refinishing work at the final blue-top stage was primarily caused not by errors in the bluetops, but by the extensive errors in the previously-set slope stakes and RPs [reference stakes]. The resolution of the undulations caused by erratic stakes at the time subgrade was first reached, still did not resolve the errors in the slope stakes and RPs were they averaged too high or too low * * *. Nor did it resolve the discrepancies resulting from the contractor's efforts to "eyeball it through" * * *.

In other words, plaintiff now asserts that the need to perform refinishing was largely a consequence of particular types of errors in slope and reference stakes and was not "an independent problem relating solely to bluetops." Plaintiff's Exceptions to the Commissioner's Report, p. 76. We cannot accept the contention that the commissioner misconstrued the position which had been presented to him by plaintiff.

---

2. The statements quoted above were included in the commissioner's finding 13.

This finding has been modified by the court.

First, an inspection of Plaintiff's Requested Findings of Fact and Plaintiff's Brief to the Commissioner reveals that plaintiff's basic assertions, at that stage, were: (1) the Bureau placed two different sets of blue-top stakes,[3] (2) three-fourths of the road was finished on the basis of the first set, and (3) the placing of the second set necessitated extensive reworking. Although plaintiff noted that the final set of blue-top stakes did not correspond with the subgrade stakes,[4] greater emphasis was given to the difference between the two sets of blue-top stakes. In any event, plaintiff did not expressly state its notion as to the causal relationship between refinishing and areas where slope stakes averaged too low, etc. Thus, we conclude not that the commissioner was guilty of misstatement, but that plaintiff has altered the nature of its argument.[5]

Secondly, we are in substantial agreement with Commissioner White's conclusion that plaintiff has failed to prove its claim regarding refinishing. To establish this claim, plaintiff must show that reworking was accomplished and also that responsibility for the duplication of effort belonged to the Bureau of Public Roads.[6] Certainly, it is not sufficient for plaintiff to demonstrate that, in certain regions, the slope and reference stakes averaged too high or too low (as opposed to varying sharply). Nor is plaintiff's burden met by showing that, upon occasion, plaintiff's workmen resorted to "eyeballing," i. e., that they disregarded the Bureau's stakes and proceeded on the basis of visual inspection of the grade.

Witnesses of plaintiff did state that substantial amounts of reworking or refinishing were necessary. However, the Government offered testimony to the contrary. We are not persuaded that, in resolving these factual questions against plaintiff, Commissioner White committed error. With respect to this matter, the following quotation from Davis v. United States, 164 Ct.Cl. 612, 616 (1964), is pertinent:

> In this, as in all cases in which a Commissioner has carefully weighed conflicting evidence, the burden of sustaining exceptions to the findings is far from slight. We start with the double directive that due regard must be given to the Commissioner's opportunity to judge the credibility of the witnesses and that his factual findings "will be presumed to be correct." Rule 48 [now Rule 66]. That presumption is dissipated only by a strong affirmative showing. Where, as often happens, what appears to be a sound objection to a finding is answered by an equally sound explanation in support of it, the presumption will carry the day. Where the specific testimony of witnesses, believed by the trier-of-fact, is countered only by the advocate's theoretical arguments which may or may not be correct, we must ordinarily accept the trier's evaluation. The same is true

---

3. The nature of blue-top stakes is explained in finding 6(e).

4. Defendant points out that blue-top stakes are set independently of slope and reference stakes. Blue-top stakes indicated the final grade which was to be 1 foot above the subgrade. In order to achieve final grade, a layer of cushion material was placed upon the subgrade.

5. It should be noted that Rule 57(f) (2) (which is identical in substance to Rule 45(e) of the 1957 revision of the rules of this court) provides: "Unless a party has requested a particular finding of fact, the court may refuse to consider his exception to the commissioner's report for failure of the commissioner to make such finding." In the present case, we have deemed proper consideration of plaintiff's exceptions, but the policy behind the quoted rule is one factor to be considered in assessing those exceptions.

6. At the outset, we note that it is not clear that the Bureau did place, over extensive areas, two sets of stakes indicating the final grade. The Bureau's diaries, upon which plaintiff places reliance, appear to have used the terms "bluetops" and "grade stakes" to refer to the same stakes. Thus, plaintiff acknowledges that the first set of stakes (those placed prior to July 1953) may have been grade stakes rather than blue-top stakes as such.

where the Commissioner has preferred one witness to an event (or set of witnesses) over another. Stronger assaults must be launched before the recommended findings can be overthrown. This is not to abdicate the court's function as the ultimate finder of the facts. In a fallible and busy world, all that can be required for the due administration of justice and the foundation of a judgment is that, when the balance is close, we rely on the appraisal of an unprejudiced trier who has followed a process which will generally bring about a correct determination.

Accord, Commerce Int'l Co. v. United States, 338 F.2d 81, 167 Ct.Cl. 529, 537 (1964). In the present case, plaintiff's arguments do not warrant a conclusion (contrary to the one reached by the commissioner) that plaintiff performed vast amounts of refinishing for which it is entitled to recover damages.

Implicit in the commissioner's report is the view asserted by defendant that plaintiff's post-July 1953 operations included normal finishing, not refinishing caused by staking errors. This view is supported by the testimony of defendant's witnesses. One persuasive factor is the apparent failure of plaintiff's personnel to register complaints during the period in question. It is reasonable to suppose that, if staking errors had caused substantial refinishing, this problem would have been made known to the Bureau's employees. Yet, with a limited exception, plaintiff has failed to show that any such difficulty was communicated to the Bureau.

There was one area (stations 750–790) regarding which the Government did accept responsibility for excessive difference between the final grade (indicated by blue-top stakes) and the subgrade. The subgrade was approximately 1½ feet below final grade, i. e., 6 inches too low. However, plaintiff was required to do only limited corrective work, since the Bureau lowered the final grade in order to make it correspond with the grade as constructed. Thus, although there were staking errors, the adjustment in grade meant that the damage to plaintiff was relatively slight.

With regard to a substantial area west of Williams Creek, the Bureau permitted an alteration which was beneficial to plaintiff. The depth of the cushion placed by plaintiff was less than the 1 foot required by the specifications. In order to compensate for the insufficient cushion and to provide for drainage, it was agreed that plaintiff would drill a ditch which went below the original design. Plaintiff was paid for drilling the ditch, and we agree with defendant that there is no basis for additional recovery by plaintiff.

In another region, located east of Williams Creek, it was necessary for plaintiff to rework the subgrade. As defendant points out, this additional work was required because the subgrade had subsided during the winter shutdown. This remedial operation cannot be attributed to staking errors, but it must have affected plaintiff's productivity.

The above examples and others emphasized by defendant help to explain the nature of plaintiff's activities during the period of July to October 1953. In general, defendant's specific illustrations support the conclusion of the commissioner. An exception is the area (stations 750–790) in which the Bureau lowered the grade; as indicated above, plaintiff did sustain some damage there despite the adjustment in grade. With this exception, we find that plaintiff has failed to establish its claim as to refinishing. Therefore, the primary and essentially the sole bases for recovery by plaintiff are the breaches which were shown to have occurred during the pre-finishing stage.

THE MEASURE OF RECOVERY

We must first consider the matter of plaintiff's overall expense. Commissioner White determined that plaintiff's total costs for construction of the road were $527,859.62 and that, of this total, the amount of $449,812.62 was allocable to unclassified excavation. See finding 14.

Plaintiff takes exception to this finding. First, according to plaintiff, its equipment costs were greater than the amount utilized by the commissioner. Plaintiff declares that, having adopted the Government's accounting theory, the commissioner then erroneously limited equipment costs to the sum attributable to depreciation. That is, plaintiff charges that the commissioner failed to consider other costs of ownership such as the expenses of operating the main shop, of outside repairs, and of supplies and grease. Plaintiff's assertions are not well taken.

Apparently, plaintiff fails to consider the significance of the indirect expenses included in the commissioner's total. For example, under the category of "FROG [fuel, repairs, oil, and grease] and other indirect expense relating to equipment," Commissioner White used the amount of $81,196.02. This sum includes many of the "other expenses of ownership" about which plaintiff complains. Obviously, there is no basis for including such items twice, once as a direct and once as an indirect expense. In short, we find that there were no omissions by the commissioner of properly established equipment expenses. All such expenses were included either under direct equipment costs or under one of the categories of indirect expense.

Plaintiff also contends that the commissioner failed to allocate a sufficiently high percentage of the total labor costs to unclassified excavation. Plaintiff states that the allocation rate should be 87.5 percent, not 85 percent. Basically, plaintiff's view is that, because the staking errors caused inefficiencies primarily in unclassified excavation and not in other contract items, a disproportionately large share of labor costs was attributable to unclassified excavation. As indicated previously, we have declined to ac-

cept much of plaintiff's argument regarding its inefficiencies. This is one reason for rejecting the view of plaintiff as to allocation. Moreover, considering the payments for and the nature of the construction, the percentage used by the commissioner is reasonable. Thus, we conclude that each of plaintiff's exceptions pertaining to the matter of costs must be rejected.

According to plaintiff, its recovery should amount to 24 percent of the expense of unclassified excavation. The basis for this contention is a production analysis prepared by plaintiff's engineering consultant, Mr. Arden Morgan. Without explicit reference to the Morgan study, Commissioner White determined plaintiff's damages to be 8 percent of the costs of unclassified excavation, i. e., $35,985.

Like Commissioner White, we have found that plaintiff failed to establish a substantial part of its claim, the portion pertaining to refinishing. Accordingly, plaintiff's award must be considerably less than the claimed 24 percent. As the commissioner's reliance upon the "jury verdict" approach indicates, precise measurement of plaintiff's damages is not possible. Under these circumstances, our task is to make a reasonable approximation of the monetary injury resulting from the Government's staking errors. Cf. Dale Constr. Co. v. United States, 168 Ct.Cl. 692, 729 (1964).

Morgan's analysis is intended to show the loss of productivity suffered by plaintiff during performance of the contract. His method was to contrast (for each month of construction) the actual amount of unclassified excavation performed and plaintiff's "net practical production capacity." [7] To illustrate, for the period March 15 to April 15, 1953, Morgan de-

7. Plaintiff states that Morgan's study is analogous to the theories of recovery used in Houston Ready-Cut House Co. v. United States, 96 F.Supp. 629, 119 Ct.Cl. 120, 193 (1951), and Maryland Sanitary Mfg. Corp. v. United States, 119 Ct.Cl. 100, 118 (1951). From a theoretical standpoint, there may be some analogy.

However, a basic element in Morgan's analysis is the item "net practical production capacity." To some extent, this item is based upon experience in the construction industry, but it also reflects numerous subjective notions of Mr. Morgan. Also, Morgan's study rests partly upon inaccurate data; this is discussed infra.

termined that plaintiff's work force was such that its "total production capacity" was 61,200 cubic yards of excavation. Next, after deducting production losses which Morgan considered to be the responsibility of plaintiff (13,400 cubic yards), he reached a "net practical production capacity" of 47,800 cubic yards. Actual production during the period (according to Morgan's figures) amounted to 34,715 cubic yards. Thus, he concluded that actual production was 73 percent of "net practical production," and that plaintiff's loss of efficiency for the month was the difference, or 27 percent. Plaintiff seeks to attribute this and all similar losses of efficiency to the Government. Plaintiff states that each decrease in efficiency meant a corresponding increase in the expense of performing the excavation.

As defendant points out, Morgan's study contains numerous defects (aside from the fact that it purports to substantiate plaintiff's "refinishing" claim). It will suffice to mention a few of them. As the amount of total actual yardage, Morgan used 451,839 cubic yards; this sum is insufficient for a variety of reasons. In fact, plaintiff was paid for 456,295 cubic yards on the basis of Bureau estimates and for an additional 1,753.8 cubic yards as a result of an equitable adjustment made by the contracting officer. Moreover, plaintiff did a substantial amount of actual work for which it was not entitled to be paid. One example of such work was 15,712 cubic yards of overbreakage (regarding which plaintiff's administrative claim was denied). Since Morgan's figure for actual production was too low, his overall conclusion as to plaintiff's efficiency is also too low.

The "net practical production capacity" which Morgan attributed to plaintiff appears to be excessive. For example, it is by no means clear that he gave sufficient weight to such matters as abnormal weather or carelessness on the part of plaintiff's personnel. Failure to attribute adequate significance to factors of this type means that the Government was charged with too large a part of the responsibility for the losses of productivity. Nonetheless, if an appropriate allowance is made for the flaws in the Morgan analysis, one way to test the reasonableness of the judgment recommended by the commissioner is to compare that amount with data used by Morgan. Since, for the most part, we have rejected plaintiff's "refinishing" claim, we shall limit our comparison to the three production periods during which the problem of "erratic stakes" had substantial effects.[8]

In addition to determining percentages of efficiency, Morgan computed corresponding amounts which allegedly represented the increased costs for which the Government was responsible. Plaintiff does not rely on the dollar amounts determined by Morgan. However, since in no event is precision possible, it should be permissible to use Morgan's amounts as the basis for comparison. For the three periods, the increased costs determined by Morgan totaled $37,821.[9] The difference between the latter sum and the amount recommended by the commissioner ($35,985) is $1,836. Thus, it is apparent that the commissioner's amount is roughly comparable to that computed by Morgan.

Because of the many defects in the Morgan analysis, a larger reduction in the dollar amount computed by Morgan (or the amount claimed by plaintiff)

---

8. According to plaintiff, the difficulties with "erratic stakes" occurred during the following periods: October 15 to November 15, 1952; March 15 to April 15, 1953; and April 15 to May 15, 1953.

9. The above total was arrived at as follows:

| Period | Amount of increased costs |
| --- | --- |
| 10/15/52 to 11/15/52 | $6,693 |
| 3/15/53 to 4/15/53 | 9,720 |
| 4/15/53 to 5/15/53 | 21,408 |
| Total | $37,821 |

might be more proper. However, considering the fact that some recovery is in order for periods other than the three in question (*e. g.*, for the period when the final grade was lowered by the Bureau), we are willing to accept the amount determined by Commissioner White. We conclude, therefore, that plaintiff is entitled to recover $35,985, and judgment is entered for plaintiff in that amount.