### H. JOHN HOMAN CO., Inc.
v.
### The UNITED STATES.
### No. 128-66.

United States Court of Claims.
Nov. 14, 1969.

Edwin J. McDermott, Philadelphia, Pa., attorney of record, for plaintiff.

Sheldon J. Wolfe, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner William E. Day with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on February 4, 1969. Exceptions to the commissioner's opinion, findings and recommended conclusion of law were filed by defendant and plaintiff requested that the court adopt the commissioner's findings, opinion and recommended conclusion of law except for a requested addition to one finding.* The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, with a modification in the amount of recovery, it hereby adopts the same, as modified, as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $59,-715.10.

Commissioner Day's opinion, as modified by the court, is as follows:

This is a contract case. The plaintiff sues for breach of contract, charging that its performance of contract work was unreasonably delayed by the defendant, to plaintiff's damage. At pretrial it was agreed that the only issue for trial was whether or not the defendant caused plaintiff to be unreasonably delayed in the performance of the contract work. The proof shows that the plaintiff is entitled to prevail on this issue and it is therefore entitled to a judgment for the damages it established. There is no question in this case relating to the application of the Wunderlich Act because the claims made are not redressable under the contract, there being no suspension of work clause included in the contract provisions. United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). (1966).

The material facts have been set forth in detailed findings which will be summarized for consideration of the controlling legal principles.

In June 1964, the defendant, through the General Services Administration (hereafter called GSA) issued an invitation for bids at a fixed price for the extension and modernization of the United States Post Office at Mount Holly, New Jersey. Bid opening was conducted on June 16, 1964, and (at $269,841) the plaintiff's was the lowest of the six bids received. The other bids ranged from $286,445 to $343,897, with the third low bid at $290,000. The government estimate for the work (made on August 12, 1964) was $248,800.

The specifications for the work on which bids had been sought and received, provided a definite sequence for the work, because it was understood that the post office was to continue its function of postal operations during performance of the work.

A few days after the bid opening, the GSA superiors of the officials who had issued the invitations for bid directed a change in the sequence of operations. Thereafter and before the award of a contract to the plaintiff, a conference was held between representatives of the

---

* Plaintiff's motion for leave to file an untimely exception to one of the trial commissioner's findings is denied.

plaintiff and the GSA regional office to discuss the change in sequence of the work which had been directed by higher GSA authority. At this conference, the plaintiff agreed to perform the work, with the changed work sequence, at the bid price. Based upon such agreement, contract GS–02B–11, 826, dated August 12, 1964, was awarded to the plaintiff, with the change in work sequence denominated as Change Order No. 1. The contract price for the work was $269,841, with the work to be completed in 270 days from receipt of notice to proceed. Since the notice to proceed was received on August 24, 1964, the scheduled completion date was May 20, 1965.

The contract work was substantially completed in 350 days, thus there was an overrun of 80 days beyond the scheduled completion date. There was a provision for liquidated damages of $50 per calendar day, but none were assessed or paid.

The contract as let provided for the modernization and revision of a 64′ x 56′ post office so as to extend it by 30′ x 64′, with a new mailing platform 40′ x 24′ and an extension of the parking and truck maneuvering area behind the structure from an area 40′ x 70′ to an area 60′ x 144′, as well as extensive interior and exterior modernizations and alterations.

The work got off to a bad start, due to the fact that the site survey was defective, in that the metes and bounds as shown on the site plan (one of the contract drawings) would not close.

The discrepancy in the survey was called to the attention of GSA representatives at a meeting on September 2, 1964. This was apparently prior to the time the defendant retained the Alfred Clauss firm as its supervising architect, two of whose representatives attended the meeting. On September 9, 1964, Chester Jones (one of the two), project engineer of the Clauses firm, was on the job for an inspection visit. He was told of the discrepancy in the site survey and of the impossibility of beginning the excavation for the extensive retaining wall until the

discrepancy was corrected. Jones phoned the GSA construction engineer, Curotola, at his New York office, advising him of the discrepancy in the site survey. Jones was told to have the plaintiff proceed with demolition of the old swing room until the survey problem was resolved.

GSA formally solicited bids from various surveyors for a resurvey of the site plan and it was not until September 30, 1964, that a surveyor was hired by GSA to do the work. The survey was not completed until October 21, 1964. Until this was accomplished, it was not possible for the plaintiff to proceed with the excavation for the retaining wall, the erection of which (plus backfilling) was the key to an orderly beginning of the work for the reason, among others, that with the wall in place and backfilled, much needed ground space would have been provided for the storage of material and equipment needed for the work, as well as space for the parking and maneuvering of post office trucks moving mail in and out of the post office. With the retaining wall constructed and backfilled, there would have been a great deal more space for the use of trucks delivering and unloading of material and equipment as well as for general construction activities.

As shown in finding 4, there were 11 steps in the mandatory construction sequence covered by Change Order No. 1. The preamble stated that all construction work *must* be planned in conformance with the 11-step sequence and construction sequence drawings 27–3. It further provided that the work must further be coordinated with the construction engineer and custodian of the building to the end that normal seasonal functions of the post office would not be impaired by reason of the construction work. It further provided:

\* \* \* \* \* \*

b. The following sequence steps are specific in nature and are to be used as a sequence of construction for the subject project:

(1) Construct all new retaining walls \* \* \* around new maneuvering

area, backfill and grade and make suitable for vehicle usage.

(2) Locate oil tank in offset maneuvering area, excavate, install tank, backfill and make suitable for vehicle usage.

(Steps 1 and 2 may be done concurrently. Step 3 should not be started until the previous steps are completed.)

\* \* \* \* \* \*

Since plaintiff was prevented (by the defective site survey) from beginning the work as planned and in an orderly manner, it proceeded with work as directed, which was step 5 in the construction sequence. The defendant argues that the retaining wall work was not essential and other productive work was being accomplished. On the facts, however, the defendant's position is untenable. To be sure, the plaintiff did not stop work; it did other work. But the beginning of the job was seriously interfered with and the work which was done, was done under the handicap of inadequate working space and at greatly reduced efficiency. The failure to have a correct site survey required the concreting operations on the retaining walls to be accomplished in cold weather, whereas the work would undoubtedly have been performed in the early fall. It was not until October 23, 1964, that plaintiff (relying on the new survey which had not even then been officially furnished to its superintendent) was able to stake out the lines for the retaining walls. Excavation for the walls began promptly (by November 2) and was finished for that part of the wall along the creek, by November 6, with piling to follow. After the placement of the piling by pile drivers, the framing for the concrete walls was set in place with the required reinforcing steel.

Photographs in evidence show that the concreting operation for the retaining walls was well under way by December 1, and that the framing was stripped away by January 4, 1965. By the latter date, it had been possible to backfill only a part of the length of the retaining wall along the creek. This was accomplished by the plaintiff as soon as plaintiff was able to do so in order to provide much needed work space in the construction area. Item 2 of the work sequence (under the change order) was the relocated oil storage tank. It was in place by February 1, 1965, and plaintiff was then—and only then—able to backfill the retaining wall in the offset maneuvering area where that tank was located.

Photographs in evidence bearing the February 1, 1965, date show that it was necessary to use the top of the newly poured retaining wall as a temporary storage place for the metal roof joists which were ultimately destined for the building addition. This is mentioned only because it points up the dire need of working space by the plaintiff until the entire retaining wall was backfilled.

When the retaining wall was completed and backfilled, interference with the work which was in process came to an end and the outside work proceeded without incident.

The contracting officer (upon the plaintiff's request) extended the contract time 24 days on his finding that the delay in completion of the plot survey delayed the plaintiff's work. An extension of one additional day of time was granted because the plaintiff (although ready with his forces to do so on a holiday—February 22, 1965) was unable to work because no employee of the post office was present at the building, even though arrangements had been made earlier for the presence of the necessary post office officials.

It should be noted that the defendant had no resident engineer on the job. The supervising architect (Alfred Clauss) had two architects who made periodic visits. Mr. Cranmer (the senior of the two) visited the job weekly and Mr. Chester jones, the project architect, visited the job more frequently but not every day. Whenever any problem of any consequence was called to Mr. Jones' attention, the reports he filed show that he referred the problem to the GSA en-

gineers for their consideration and resolution.

The plaintiff was delayed in connection with ducts in the existing workroom. Structural members supporting the roof required relocating the ducts. The ATC panel board and the air-conditioning panel board as shown on the drawings interfered with the air-conditioning ducts. After conferences at which this subject was discussed, it was decided that a new layout would be submitted for approval by the defendant with the changes made as needed to meet the interferences referred to above. A hold order was placed on the fabrication of structural steel designed to support the weight of the new vault. This was because the structural steel to be placed in the basement to support the vault on the first floor had to fit in with other work in the boiler area of the basement. This hold order interfered with the installation of piping in the boiler room by the mechanical subcontractor and also with the laying of brick in the wall on the first floor, since the wall could not be erected until the structural steel supporting it below was in place. Revisions in the duct work delayed the plaintiff's work from January 8 to March 16, 1965. The structural steel hold order delayed the work from January 22 to March 23, 1965.

The plaintiff was prevented from installing the temporary dust partitions (TDP) in the work areas of the first floor according to the contract plans. The plans called for one TDP between the public lobby and the existing workroom at the counter line. This TDP was installed in the place shown on the plans. The plans showed two further TDP's separating the first floor area into three work spaces. The defendant required that one TDP be omitted and that the other be moved towards the center of the existing workroom. This caused disruption to the plaintiff's floor work which.involved the removing of an existing wood floor, replacing it with concrete and then covering the concrete with asphalt tile. Instead of doing the floor work in three sections, completing the various steps mentioned, one section at a time, the plaintiff was forced to do the work in smaller areas which made for markedly reduced work efficiency requiring two weeks to do what would have been done in 5 or 6 days without this disruption.

The TDP at the public lobby has been mentioned. The plaintiff had intended to use patent scaffolding to carry this TDP. Such scaffolding is easily and quickly erected. The plaintiff was not permitted to use the simpler, faster method, but was required to erect a substantial load-bearing scaffold. The entire work in areas 7 and 8, had plaintiff been permitted to proceed with temporary dust partitions and patent scaffolding, could have been accomplished in about 14 working days—whereas 8 to 9 weeks were needed to do the work, with the method directed by the defendant.

As indicated earlier, the contract called for the construction of a new vault. The existing vault (which was to be replaced by the new vault in a different location) was to remain intact until the new vault was completed. The specifications, however, required that the door from the existing vault was to be used as the door for the new vault. It was obviously not possible to use the door for the old vault and begin the new vault construction, though completion of the new vault with the old vault door was called for. As in the other instances of delay and disruption heretofore mentioned, delay in connection with the vault door, in turn, delayed other parts of the work. On or about March 22, 1965 (the day the plaintiff was ready to begin work on the new vault), the defendant began efforts to locate and obtain another door for use in constructing the new vault. The door and frame thereof had to be set in place before the brick walls could be erected for the front of the vault. The structural steel supports for the walls were in place by March 24. The door, which was needed March 22, was not at the site until April 9, despite the fact that when one was located, the plaintiff sent for it and had it delivered by

its own truck. As soon as it was received at the site the door was set in place with its frame, and brick masons promptly set to work laying the brick walls which could not be done until its arrival. The new vault was completed by April 30, 1965.

Until this date, it was not possible to pour the concrete pads to support the air-conditioning units. This was due to the fact that ducts for such units could not be installed until openings for them were made in the old vault floor, which had to remain intact until the new vault was completed. With the new vault door at hand, together with its frame, the plaintiff could have accomplished the work in connection with the new vault and the demolishing of the old vault in 20 to 22 days instead of the 2 to 2½ months actually required for the work.

The plaintiff, it is to be noted, was given a 24-day time extension for performance of the contract work, by reason of delayed delivery of a door for the new vault.

On February 10, 1966, the plaintiff filed a claim with the contracting officer on account of delays to the work by reason of the inaccurate boundary survey, late delivery of the vault door and the revised sequence of operations. In a reply received by the plaintiff shortly thereafter, the contracting officer advised that absent a suspension of work clause in the contract, he was without authority to consider a claim for delay.

The plaintiff in the performance of the entire job was an efficient contractor. This is supported by the whole record and particularly by the reports of field inspection submitted to the defendant by the project engineer of its privately retained architect-engineer.

Despite its efficient prosecution of the work, the plaintiff required an additional 80 days for its performance and sustained a net loss of approximately $92,000 upon its completion. For 18 of those days defendant issued a change order which extended the contract time and equitably adjusted the price. These periods, totaling 18 days, were concurrent with the part of the delay involved in the case and, accordingly, plaintiff has already been compensated for those 18 days.

The facts of this case as outlined above bring this case within the rule announced by this court in Luria Bros. & Co. v. United States, 369 F.2d 701, 707, 177 Ct.Cl. 676, 687 (1966):

* * * It is well-settled that when the Government orders a structure to be built, and in so doing prepares the specifications prescribing the character, dimension and location of the construction work, it implicitly warrants that if the specifications are complied with, satisfactory performance will result. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); Laburnum Constr. Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963). * *

■ The findings show that 62 of the 80-day overrun on the contract was attributable to the disruption to the work caused by the defective contract specifications as well as the failure of the defendant to provide timely the vault door and frame for the new vault, upon which so much depended. Under the authority of the cited cases, the plaintiff is entitled to recover the damages it incurred because of this delay.

■ The defendant argues that the plaintiff's loss on the contract, which the proof shows to be $92,000, was due to an improvident bid. It is demonstrated, however, that the plaintiff's bid was higher than the government estimate and quite in line with the next two bidders. It is concluded that the plaintiff's bid was provident. The amount of the plaintiff's loss is mentioned only as a comparison to the amount of damages which the plaintiff has established by the proofs. The plaintiff has shown that it expended $68,104 for labor in five categories of work, which were directly involved with the defective specifications and the vault door problem. It had estimated $31,014 for this labor—the difference is $37,090

and this amount is fairly chargeable to the defendant. It is true that the total cost theory of proving damages in a contract case is not generally favored. Under proper safeguards and where there is no better proof it has been upheld. J. D. Hedin Constr. Co. v. United States, 347 F.2d 235, 171 Ct.Cl. 70, 86 (1965), F. H. McGraw & Co. v. United States, 130 F.Supp. 394, 131 Ct.Cl. 501, 511 (1955).

The plaintiff's direct costs on the instant contract amounted to $297,706, compared with $463,830 for all other work during the period of performance. The percentage relation between the instant contract to all work is 39.1 percent.

Applying this percentage to plaintiff's overhead expense for the period August 1, 1964, to August 31, 1965, of $289,252, it is shown that the overhead allocable to the instant contract during that period is $113,098. The evidence shows that of the latter amount, $30,039 was the type of overhead expense incurred on a calendar day basis, and $83,059 was incurred on a working day basis.

Since it is found that 62 of the 80-day overrun on the contract performance was caused by disruption to the plaintiff's work by the defendant, the plaintiff is entitled to recover its additional overhead of:

$$80/350 \times \$30,039 = \$6,866.01$$
$$68/240 \times \$83,059 = \$23,533.11$$

| Per Day | Days | Amount** |
|---|---|---|
| $85.825 | 62 | $5,321.15 |
| $346.079 | 50 | $17,303.95 |
| Total | | $22,625.10 |

Adding the extra labor costs of $37,090 to the above amount results in a total of $59,715.10, for which judgment should be entered.

** This computation is that presented by defendant at fn. 4, page 9, of its brief filed May 19, 1969.