LEWIS–NICHOLSON, INC., et al.,
a Joint Venture,

v.

The UNITED STATES.

No. 93–73.

United States Court of Claims.

Feb. 23, 1977.

Stuart R. Pollak, San Francisco, Cal., attorney of record, for plaintiff. Robert E. Gooding and Howard, Prim, Rice, Nemerovski, Canady & Pollak, San Francisco, Cal., of counsel.

Robert M. Hollis, Washington, D.C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D.C., for defendant.

Before DAVIS, KASHIWA and KUNZIG, Judges.

OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Lloyd Fletcher, filed June 22, 1976, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the said recommended decision, as hereinafter set forth *, it hereby affirms and adopts the decision as the basis for its judgment in this case. It is therefore concluded that plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c).

OPINION OF TRIAL JUDGE

FLETCHER, Trial Judge: This contract case involves the building of a mountain road in the Sierra Nevada and presents a study in what, during a moment of frustration, one employee of the contractor described as "chaos and confusion." While this rhetorical description is overstated, the trial record generally shows inadequate advance planning by the Bureau of Public Roads (BPR), failure to coordinate and consult with the United States Forest Service on such advance planning as was done, some timidity and indecision on the part of the Project Engineer possibly attributable to inexperience with difficult and mountainous terrain, numerous staking delays and errors, an undermanned survey crew, all culminating in misunderstandings and communication failures with resulting hostility between Government and contractor personnel. These problems are detailed in the findings of fact below. Here they will be summarized to the extent necessary to show that the defendant must be held to have breached its contractual obligation not to prevent, interfere with, or unreasonably

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed June 22, 1976, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

delay the contractor's performance.[1] See, *J. G. Watts Const. Co. v. United States,* 355 F.2d 573, 174 Ct.Cl. 1 (1966).

Plaintiff is a joint venture registered in the State of California. Its management personnel have all had extensive experience in the construction of roads and highways, particularly in mountainous areas involving heavy rock excavation, extensive clearing and grubbing coupled with bridge construction and paving work. One of plaintiff's important managers was Richard A. Lewis who has had long experience in mountain road construction and who was assigned by plaintiff to be its project manager for the job here involved.

On May 29, 1967, BPR issued an Invitation for Bids for California Forest Highway Project 24–1(3), calling for clearing, grading, and construction of a concrete girder bridge on 7.565 miles of California Forest Highway Route 24.[2] The stretch of road to be constructed under the contract was described in the IFB as "located approximately 5 miles south of Blairsden, California, beginning at the south boundary of Plumas County, and extending 7.565 miles (including 0.020 mile bridge) northerly to a junction with State Route 89 near Graeagle, California." The site is about 50 miles northwest of Lake Tahoe, Nevada.

After visiting and viewing the project site, representatives of the plaintiff joint venture prepared their cost estimates and on June 29, 1967, submitted a bid in the amount of $1,295,354. Plaintiff was awarded the contract on July 7, 1967.

On the occasion of his initial visit to the site, Lewis and his companions walked the entire right-of-way. He noted that the BPR had staked nearly all the center, or control, line and had even installed some slope stakes at the lower end of the project. To him, this "decent start" meant that he could count on the job being "pretty well staked before we would get any amount of activity." Normally a road building contractor is entitled to assume that, prior to the start of construction, the property owner will have substantially completed the construction staking necessary to the contractor's construction crews, and plaintiff's bid was based on such an assumption. A prudent contractor, however, also recognizes that some changes may become necessary as work progresses. This fact is reflected in the present contract by the following provision:

4.2 Changes. It is mutually agreed that it is inherent in the nature of highway construction that some changes in the plans and specifications may be necessary during the course of construction to adjust them to field conditions and that it is of the essence of the contract to recognize a normal and expected margin of change within the meaning of the clauses "Changes" and "Changed Conditions" in the "General Provisions" of the contract as not requiring or permitting any adjustment of contract prices, provided that any change or changes do not result in (1) an increase or decrease of more than 25 percent in the original contract amount, in the quantity of any major item, or in the length of project, or (2) a substantial change in the character of the work to be performed under a contract pay item or items that materially increases or decreases the cost of its performance.

As previously stated, the construction contract was awarded to plaintiff as low bidder on July 7, 1967, for a contract price of $1,295,354. It provided for commencement of work within 10 calendar days after receipt of notice to proceed and required completion of the work within 320 calendar days subject to authorized extensions. It incorporated by reference the "General Provisions (Standard Form 23–A)," Public Roads Specifications FP–61, Special Provisions and Bid Schedule for this particular

1. The trial judge to whom this case was originally referred, directed that the initial trial be limited to the issues of law and fact relating to plaintiff's right to recover, as contemplated by Rule 131(c). Hence, the determination of the amount of recovery, if any, has been reserved for further proceedings.

2. See Map of Location Plan attached to findings of fact.

job referred to briefly as "F.H. 24–1(3), Gold Lake," together with 50 sheets of construction plans.

Lewis and two associates were primarily responsible for the development of plaintiff's plan for the performance of this contract. Their planning centered around a basic assumption that entire job could be accomplished in two construction seasons, i. e., 1967 and 1968.[3] With this fundamental objective in mind, plaintiff's personnel established as a matter of first priority the performance of clearing the entire job during the 1967 construction season. This was deemed absolutely necessary to the end that all the clearing debris could be disposed of by burning during the one intervening winter season which was the only time that the United States Forest Service would permit any significant burning operations. Of course, plaintiff's personnel also hoped to perform as much actual construction work as possible during the first year, and because of access problems[4] they further deemed it essential to complete substantially the construction of the bridge involved, the latter work having been subcontracted by plaintiff.

On July 25, 1967, following some preliminary meetings, a formal preconstruction conference was held by which time the BPR project engineer, Douglas McCullough, had arrived at the site. During this conference, plaintiff's representatives repeated their previously expressed intentions to perform all clearing operations, and to complete the bridge over Frazier Creek during the 1967 construction season. They also designated specific areas where they desired to begin clearing operations. One of these areas, however, encompassed a line change which had not yet been fully designed. Accordingly, McCullough gave plaintiff the option of waiting for the line change to be completed, or, alternatively, of simply clearing to the clearing flags then installed at approximate locations. From prior experience in performing clearing operations to approximate locations, plaintiff's representatives had determined that such procedure was inefficient and costly because of the possibility that reclearing would later become necessary. Consequently, plaintiff chose the option of waiting the completion of the new line change with subsequent setting of slope stakes and precise clearing flags before performing any clearing operations.

There was also discussion at the preconstruction conference of the critical McGovern Area lying between Stations 740 and 759. Plaintiff's superintendent stated his intention to begin work in that area "right away," in order that the area could be cleared and provide access to the upper part of the bridge site. Despite the fact that the area from Station 740 to 759 was fully slope-staked and ready for plaintiff's construction operations, the plaintiff was not permitted to perform work within the area until further studies were made with respect to the problem of the McGovern water supply, described below.

Shortly after the preconstruction conference, BPR issued its Notice to Proceed. Plaintiff timely commenced construction operations and satisfactorily completed the contract work on November 16, 1968. The work was completed by plaintiff in a little less than three-quarters of the time allowed

3. Due to the prevalence of snow and other adverse weather conditions, it is generally impossible to perform road construction work in the High Sierra Mountains during the winter months and early spring. Hence, a "construction season" as that term is used herein refers to a period beginning in middle or late April and extending into early or middle November.

4. Plaintiff recognized that access to the project was quite limited and presented a definite problem for its construction operations. There was access to the project from public roads at its

beginning at Station 417, as well as at its end at Station 828. Further, two public roads intersected the project at approximately Stations 470 and 740. Thus, plaintiff was assured of access to the project only at four locations: Station 417, Station 470, Station 740 and Station 828. In addition, a few private roads intersected the project and constituted possible access points. As noted below, one of these (the McGovern road) was later used extensively by the contractor albeit under difficult circumstances.

to it under the contract. This result was obtained by plaintiff through a late acceleration of its performance in order to complete the job within two construction seasons which all agreed was the cheapest and most efficient approach.

From the beginning of the work, plaintiff was plagued with errors by BPR personnel in the setting of major construction stakes. Under the contract, it is the responsibility of the BPR project engineer to set all construction stakes which, in the words of the contract, "shall constitute the field control by and in accordance with which the contractor shall govern and execute the work." The major construction stakes are clearing flags,[5] slope stakes,[6] culvert stakes,[7] reference point (RP) stakes,[8] and bank plugs.[9]

From the extensive record herein, both testimonial and documentary, I have found as an ultimate fact that the Government's performance of the required surveying and staking was unreasonably slow and that an unusual number of staking errors were negligently made. This conclusion is fully supported by the many references to continual staking problems in the vast majority of BPR monthly inspection reports, weekly narrative reports, and construction diaries from the commencement to very near the end of the job. A tedious quotation of these numerous entries seems unnecessary here, but it is worth recording that a substantial part of the delay is fairly attributable to an insufficient number of personnel on BPR crews, frequent turnover of such personnel, low morale, and lack of previous survey experience.

Whether all of the deficiencies had any significant impact upon plaintiff's operations, however, must await further determination.[10] The record developed thus far on the severed issue of liability clearly shows that coupled with further problems yet to be discussed, the magnitude of the BPR staking errors was such as to constitute a breach of the Government's contractual obligation not to interfere with or delay the contractor's performance, but it does not show the extent, if any, of actual monetary harm caused to plaintiff thereby. While the BPR staking errors and center line changes posed a serious problem for this plaintiff, they were not as massive in their impact on construction operations as the errors found in the *J. G. Watts Const. Co.* case, *supra.* If the staking errors were the only factors involved in this case, a finding could possibly be justified to the effect that their impact on plaintiff's operations was not sufficient to constitute a breach of contract. For example, the court found in *Watts* that over one-half of all slope and reference point stakes were in error, a percentage considerably in excess of the number of errors committed by BPR in the present case. However, the staking errors in this case were compounded by a unique problem that arose in an area known as the "McGovern Area", which was a difficult and critical portion of the road lying between Stations 740 and 759.

Mrs. J. G. McGovern was am employee of the U. S. Forest Service and the widow of a deceased Forest Supervisor in the area. Pursuant to a special use permit issued by

---

5. Under standard procedures, these flags can be set accurately only by reference to slope stakes.

6. Slope stakes are the basic guide for the contractor's excavation and embankment operations. They are set at 50-foot intervals along the roadway alignment, with two stakes being set at each location. At any given location, the two slope stakes will mark the outer limits of construction for the road at that point. The slope stake will, in other words, define the point on the ground where the contractor will either begin to excavate, or begin to place embankment.

7. Define the location, slope, and length of metal culverts placed across the roadway for drainage purposes.

8. These stakes are placed outside the construction area and contain all information necessary to re-establish slope stakes and culvert stakes when destroyed in the course of construction.

9. Bank plugs are set to furnish the contractor with necessary information as to the final exact elevation of the roadbed.

10. See footnote 1, *supra.*

the Forest Service, she occupied a house in the vicinity of the roadway alignment between Stations 743 and 750. Mrs. McGovern's house was supplied with water from two natural springs. One of the springs was located almost on the center line of the planned roadway slightly ahead of Station 747. A water line ran from this spring down the slope to Mrs. McGovern's garden, and this particular spring served as her garden water supply. The second spring was located outside the upper clearing limit at approximately Station 747 + 50. A water line from this spring ran down across the roadway alignment to Mrs. McGovern's house, and served as the water supply for the house.

The facts described in the preceding paragraph were well known to BPR personnel prior to issuance of the bid invitation, and the contract plans covering the McGovern segment showed the existing main water line indicating that it was "to be relocated" under Force Account, i. e., on a cost plus basis over the contract price. While the plans also showed the existing "secondary water line," there was no indication as to what was to be done with it. The subsequent difficulties and delays which arose during construction were apparently not anticipated although they should have been if BPR had done more adequate advance planning including consultations with Mrs. McGovern and the Forest Service. That this is now recognized by BPR is evidenced by the following recommendation contained in the Final Construction Report covering this project:

2. If possible, definite needs of Forest Service permittees [such as Mrs. McGovern] should be established before start of construction.

So far as this record discloses, no effort whatever was made by BPR in advance of construction to establish Mrs. McGovern's rights and water supply needs. The foregoing recommendation is a commendable and forthright recognition that such an effort should have been made and presumably would be made in the future.

Because of the available access road at Station 740, normal and efficient road building procedures would be to commence area clearing from Station 740 back on line towards the 700 bog and also ahead on line to Station 760 for the purpose of developing access to the bridge site. For these reasons, plaintiff's superintendent stated his intention to begin work in that area "right away." However, at the preconstruction conference held July 25, 1967, plaintiff was advised by BPR for the first time of a possible legal problem in the McGovern Area and was requested to stay out of the area until the problem was resolved. On August 15, 1967, at a meeting with Mrs. McGovern and representatives of the BPR and Forest Service, plaintiff was advised that it should perform no construction work in the McGovern Area because of the possibility that Mrs. McGovern's water supply would be damaged or completely destroyed. Mrs. McGovern was convinced that she was entitled to a temporary water supply during construction and she was supported in this view by the Forest Service. BPR, therefore, set about the designing of an alternate water system which resulted in Change Order No. 1 which was approved October 17, 1967.

As a result of the foregoing problems, plaintiff was prevented from working in the McGovern Area near Mrs. McGovern's water lines and water system from the start of construction until October 27, 1967. This constituted an unreasonable delay to plaintiff's construction operations which could have been prevented by BPR if the obvious problem of the McGovern water system had been solved prior to the issuance of its Notice to Proceed. See, *Delta Equipment & Construction Co. v. United States*, 113 F.Supp. 459, 125 Ct.Cl. 632 (1953) where an excavation contractor was held entitled to recover excess costs incurred by it as a result of delays by the Government in obtaining unobstructed access to the worksite. See, also, *Dale Construction Co. v. United States*, 168 Ct.Cl. 692, 700 (1964) upholding a claim for damages resulting from delays caused by the

Government's failure to make the worksite available.

Not only were plaintiff's clearing operations delayed and otherwise adversely affected by the Government's prohibition against working in the McGovern Area. A further complication ensued from the prohibition. If plaintiff had been permitted at the outset of construction operations to work in the area, the record clearly indicates that it could have cleared the right-of-way itself in order to obtain full access to the uphill side of the bridge site by way of the access road at Station 740. Since all agreed that it was important to complete substantially the bridge over Frazier Creek during 1967, and since access to the uphill side of the bridge was essential to this objective, plaintiff had to resort to obtaining such access by means of using a small private road leading to the McGovern house. Since Mrs. McGovern would permit the issuance of only a single key to the gate guarding her road to be carried by a supervisor, men and equipment were often delayed in gaining access to or from the bridge site. Also, the contractor was required to perform continual maintenance of the private road, and to perform other additional and miscellaneous work to procure and retain Mrs. McGovern's consent to the use of her road. This complex and unusual operation further delayed the plaintiff without its fault or negligence.

The final delay problem in the McGovern area arose because during the 1967 construction season, it became apparent to BPR that the steepness of the sidehill and the existence of several springs in the area posed a serious stability problem. A collapse of the fill would endanger the McGovern residence. It was decided, therefore, to make design changes so as to provide embankment foundation drains and compaction bench [11] giving additional stability to the fill. The delay occurred because BPR did not commence the necessary design work until after the start of the 1968 construction season, and the appropriate directives and change orders were not forthcoming until the months of May and June 1968. The result was that plaintiff could not commence unrestricted grading in the area until near the end of June. But for this delay, ground conditions were such that plaintiff could have commenced its grading around the end of April.

Finally, there were Government-caused delays to plaintiff in the failure of the project engineer to designate feasible stockpile sites for temporary storage of unsuitable material [12] and to complete in a timely manner a major grade change in the roadway at a major cut near Station 660.

There were two marshy areas along the roadway alignment from which it was necessary to excavate unsuitable material which areas became known as the "600 Bog" and the "700 Bog." The unsuitable material thus excavated was to be placed on fill slopes, but since such excavation preceded the construction of the fill slopes, it was necessary to store the unsuitable material temporarily in stockpiles. Such designations of stockpile areas as were made by the project engineer were impossible to reach at the particular stage of construction at the time of designation. Plaintiff's representatives complained of this on numerous occasions without result and finally plaintiff resorted to a technique known as "half-width construction" which involves using one-half the roadway as a stockpile area.

As a result of not being timely furnished with feasible stockpile sites for temporary storage of unsuitable materials, the con-

---

**11.** A compaction bench can best be described as a narrow "road" cut at the bottom of the embankment in order to provide a base upon which the embankment can rest. The embankment is built up layer by layer from this base, and is therefore less likely to slide down the slope.

**12.** In the contract specifications, unsuitable material is described as "unstable material or other material which is unsuitable for foundation, roadbed, or other roadway purposes." Such unsuitable material is frequently used in slope flattening, but prior to the construction of the necessary slopes, the material must be stockpiled in areas designated by the project engineer.

tractor was unreasonably delayed in gaining full access through the 600 and 700 bog areas. This delay caused duplication of effort with resulting inefficiency in the contractor's operations, especially with respect to operations in the areas between the two bogs and in the moving of the unsuitable material. These inefficiencies extended from late 1967 until September 1968, when unrestricted access through the bogs was finally achieved.

By the close of the 1967 construction season, BPR had concluded that a major grade change in the area of Station 660 was appropriate. Although it is reasonable to infer that such a grade change could have been fully designed at BPR headquarters, during the winter months, the only work in this regard accomplished during that period was the processing of the collected data through the BPR computer. The actual design work was not commenced until approximately two months after the startup of construction in the spring of 1968. It had been previously determined that the grade change would be made at the major cut near Station 660. It was not until June 15, 1968, however, that the project engineer had completed the design for this grade change and had attended to the necessary restaking of the area incident thereto.

Because of the restriction on construction activities in the McGovern Area, coupled with the absence of a feasible stockpile site, plaintiff was unable to handle the unsuitable material and to excavate the 660 cut from both directions in a normal and efficient manner. The combined effect of BPR delays in making the 660 grade change, in making the necessary design changes in the McGovern Area, and in failing to designate feasible stockpile sites was to delay the contractor until early September 1968 in developing unrestricted access from the 740 access road back on line.

It must be obvious from the foregoing description of the Government-caused delays in the performance of this road construction contract that the Government has breached the "implied provision of every contract, whether it be one between individuals or between an individual and the Government, that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance." *George A. Fuller Co. v. United States,* 69 F.Supp. 409, 411, 108 Ct.Cl. 70, 94 (1947). Indeed, not only must the Government refrain from hindering the contractor's performance, it must do whatever is necessary to enable the contractor to perform. *Kehm Corp. v. United States,* 93 F.Supp. 620, 623, 119 Ct.Cl. 454, 469 (1950). To the same effect are *J. G. Watts Const. Co. v. United States, supra; Delta Equipment & Const. Co. v. United States, supra; Peter Kiewit Sons, Co. v. United States,* 151 F.Supp. 726, 138 Ct.Cl. 668 (1957); *H. John Homan Co. v. United States,* 418 F.2d 522, 189 Ct.Cl. 500 (1969); *Dale Const. Co. v. United States, supra.* See, generally, Speck, *Delays—Damages on Government Contracts,* 26 Geo. Wash.L.Rev. 505, 518 *et seq.* (1958); and Seltzer & Gross, *Federal Government Construction Contracts: Liability for Delays Caused by the Government,* 25 Ford.L.Rev. 423 (1956).

Although not ordered by BPR to do so, plaintiff accelerated its performance in September and October of 1968 in order to ensure completion of the project before the onset of winter weather. This was done even though plaintiff still had over 100 contract days within which to complete its performance because of its concern, according to plaintiff's representatives, that it should mitigate its damages which otherwise might increase substantially in the event completion of the contract was delayed until the spring of 1969.

In light of the foregoing facts, I have concluded that defendant has breached its contractual obligation not to unreasonably interfere with or delay plaintiff's performance under Contract No. F. H. 24–1(3). Accordingly judgment herein should be entered for plaintiff with the determination of the amount of recovery to be reserved for further proceedings under Rule 131(c).

## CONCLUSION OF LAW

Upon the trial judge's findings and opinion, which are adopted by the court, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect with the amount of recovery to be determined under Rule 131(c).