**L. G. DEFELICE & SON**, Plaintiff,

v.

**GLOBE INDEMNITY CO., A. J. Santa-niello, Inc., Clement Anthony Battifarano and Alfred Emilio Battifarano**, co-partners doing business under the firm name and style of Battifarano Trucking Company, Defendants.

United States District Court
S. D. New York.

July 20, 1960.

Supplemental Opinion Aug. 11, 1960.

See, also, 23 F.R.D. 275.

**456**

Jacob I. Goodstein, New York City, for plaintiff.

Nevius, Jarvis & Pilz, New York City, for Globe Indemnity Co.

William Mertens, New York City, for defendant subcontractor.

THOMAS F. MURPHY, District Judge.

This claim for damages is brought by a general contractor against a joint venture subcontractor and its surety, and has its origins in the construction of part of the New York State Thruway. Jurisdiction is based on diverse citizenship.

Plaintiff entered into a contract with the Thruway Authority and subcontracted part of the work to defendants, a joint venture consisting of A. J. Santaniello, Inc., Clement Anthony Battifarano and Alfred Emilio Battifarano, co-partners doing business under the firm name and style of Battifarano Trucking Company (hereinafter sometimes called S & B). Under such contract the subcontractor agreed to excavate an estimated 610,600 cubic yards between stations 328 and 373 at 56¢ a cubic yard. For the faithful performance and payment of labor and material, etc. S & B gave a surety bond of defendant Globe Indemnity Company.

The complaint has six causes of action. For its first cause of action it claims it expended $179,043.54 to finish excavating 38,977.33 cubic yards left unfinished when the subcontractor S & B quit the job on November 16, 1954. Giving $21,827.30 credit for such yardage at the contract rate of 56¢ a cubic yard and for $65,748.55 retained for work actually performed by the subcontractor it claims a balance of $91,467.69.

The second cause of action is to recover $17,742.38, the amount paid by it to Geo. M. Brewster & Sons, Inc. for equipment rented by the subcontractor. The third cause of action is to recover $2,545.14, the amount paid by it to David Weber & Co. for materials furnished to the subcontractor. The fourth cause of action is to recover $10,295.73, the amount paid by it to Elmhurst Contracting Company, Inc. for equipment furnished to the subcontractor. The fifth cause of action is to recover $10,770, the amount paid by it to Charles P. Allen, agent for Talbott Contracting Corp. for equipment rented by the subcontractor. The sixth cause of action is to recover $60,462.79, the total amount for equipment rented and labor and material supplied to the subcontractor.

The subcontractor at trial interposed three counterclaims. The first counterclaim seeks recovery of $95,159.63 based upon the claimed excavation of 653,471 cubic yards at 56¢ a cubic yard ($365,-

943.76) less $270,784.13, the amount actually paid. The second counterclaim seeks recovery of $160,830.19 for additional expenses in making long hauls to distant "fill" areas because of plaintiff's breach of contract. The third counterclaim is for $480,906.01 as the fair and reasonable value of extra work, materials and equipment for excavating 469,843 cubic yards of "unsuitable materials."

The defendant surety denies liability (1) because the claims of plaintiff are not within the intendment of the bond; (2) the payments plaintiff made to the material and equipment companies were voluntary, and (3) that in connection with plaintiff's claims in causes of action two, three, four and five, § 137 of the New York State Finance Law required lien foreclosure as a condition precedent and that plaintiff failed to foreclose such liens.

Since there is little or no factual dispute concerning plaintiff's second, third, fourth, fifth and sixth causes of action it is fitting to dispose of them first.

With reference to plaintiff's second, third, fourth and fifth causes of action it was stipulated that plaintiff made the payments alleged; that the equipment and materials were used on the job site by the subcontractors; that payment of the equipment was guaranteed by plaintiff and that the surety had notice of the claims.

The only factual dispute relates to the Talbott equipment in the fifth of plaintiff's causes of action. Even as to that there is little in support of the subcontractor's denial of the rental. At most it is a lapse of memory which is amply controverted. Accordingly, we find as a fact that the subcontractor rented the equipment from Talbott, paid $2,450 on account, used the equipment and failed to pay the balance of $10,700 which plaintiff paid.

■ The only legal issue is the one raised by the surety and even that requires little discussion. It claims nonliability on these four causes of action on the theory that § 137 of the New York State Finance Law requires the unpaid materialmen and equipment lessors to file liens and then foreclose as a condition precedent for plaintiff to recover. The short answer to this contention is that the bond in question was not a bond required by any law. The obligation that was created by its terms is not a statutory obligation but a common law obligation. The cases of Chittenden Lumber Co. v. Silberblatt & Lasker, Inc., 288 N.Y. 396, 43 N.E.2d 459, and Triple Cities Construction Co. v. Dan-Bar Contracting Co., Inc., 285 App.Div. 299, 136 N.Y.S.2d 459, affirmed 309 N.Y. 665, 128 N.E.2d 318, are not apposite.

■■ The subcontractor agreed to do the work called for in the contract and agreed to pay for material, men, etc. The bond of the surety guaranteed performance of work and furnishing of materials. This promise implies a correlative promise to pay for such work and materials. Seaboard Surety Company v. Standard Accident Insurance Co., 277 N.Y. 429, 14 N.E.2d 778, 117 A.L.R. 658.

The surety's other objections that such claims are not within the intendment of the bond and that the payments by plaintiff were voluntary are without substance and are rejected.

As to plaintiff's sixth cause of action its uncontradicted proof showed that for a period of one year while the subcontractor was on the job it furnished materials and labor and rented equipment to the subcontractor of the total value of $60,771.85. It withdrew, however, from the claim the sum of $309.61.

Accordingly, plaintiff is entitled to judgment against both the subcontractor and the surety on the second, third, fourth, fifth and sixth causes of action, together with interest as follows: On the second cause of action for the sum of $17,742.38 with interest on $12,800 from November 3, 1954, and on $4,942.38 from November 20, 1954; on the third cause of action for the sum of $2,545.14 with interest from November 8, 1954; on the fourth cause of action for the sum of $10,295.73 with interest from

July 8, 1954; on the fifth cause of action for the sum of $10,770 with interest on $6,600 from August 24, 1954, and on $4,170 from November 20, 1954, and on the sixth cause of action for the sum of $60,462.19 with interest from November 16, 1954.

The principal dispute relates to the work that was performed or not performed by the subcontractor; the work that was performed by plaintiff after the subcontractor left the area; the type of work by each and the cost thereof, together with charges and countercharges of breach of contracts and damages flowing from the same.

Although the trial lasted 11 days the necessary voluminous engineering exhibits far exceed in complication the rather one-sided credible testimony. Plaintiff subcontracted part of its contract with the New York State Thruway to defendants S & B. This was an imposing written contract which made specific reference to plaintiff's general contract, the state's plans and the state's specifications, etc. In it the subcontractor promised to excavate an estimated 610,600 cubic yards of unclassified excavation (Item 2–B), between stations 328 and 373 at 56¢ a cubic yard. As part of its promise to excavate they also agreed to haul material to certain fill areas, roll and compact it so as to form an embankment for the roadway. Payment was to be made on the state engineer's determination and classification.

Since there was considerable testimony received as to other oral agreements which varied the terms of the written contract, including the definition of terms, renting of equipment, the need for certain types of equipment, whether the price per cubic yard was gross or net, etc., suffice it to say that it was most untrustworthy and we reject it as not worthy of belief and will proceed with our discussion with the finding that the contract in writing was the only contract or agreement between the parties.

The subcontractor worked for a year and abandoned the site on November 16, 1954. On November 29, 1954, a meeting was had on the site among all the parties, including the surety, at which plaintiff advised it was making a survey of the subcontractor's work and invited the attendance of all concerned. This survey was made by plaintiff's engineer during the dates between December 17, 1954, and January 7, 1955, and cross-sections prepared by him. The result of the survey and the cross-sections were sent to the defendants on January 10, 1955. It should be added that none of the defendants accepted the invitation to be present during the taking of the survey.

The subcontractor's engineer was engaged to make a similar survey sometime during January, 1955, the exact date of which was not disclosed. Actually, he made the survey on four days—April 20th and 21st and May 3rd and 4th, 1955.

On March 30, 1955, plaintiff by letter notified defendants that it intended to proceed with the completion of the subcontractor's contract, and that it intended to keep accurate records of its cost and invited defendants or their agents to be present. This invitation was not accepted, except an attorney for the surety did make two visits to the area. Plaintiff commenced to do the unfinished work of the subcontractor and completed it between the dates of April 1st and August 10, 1955, and kept daily records of its cost which it sent to defendants in August, 1955. It is this work and the attendant cost that comprises plaintiff's first cause of action.

Plaintiff's survey of the unfinished work by the subcontractor is described in Exhibit 21, and discloses some 23,935 cubic yards of excavation to be done. Subsequently the Thruway Authority extended the payment lines from 616,277 cubic yards to 638,399.97 or by 22,122.97 cubic yards. Plaintiff's cross-sections and the state's new payment lines show that the subcontractor had overcut or over-excavated in some places the state's original payment lines by some 7,080.64 cubic yards.

Plaintiff's theory and computation of damages is as follows: Although the original payment line as fixed by the

state's figures was 616,277 cubic yards, that was extended by the state after the subcontractor left the area to 638,399.97 cubic yards. It concedes that the subcontractor had excavated 592,342 cubic yards at the time they quit the job. In addition they had overcut the original payment line by 7,080.64 cubic yards or had made total excavations of 599,422.64 cubic yards. Subtracting the 599,422.64 cubic yards already done from the 638,-399.97 that the state required meant that the plaintiff had to do 38,977.33 cubic yards to complete the job.

Using these figures plaintiff's computations are as follows:

```
To complete subcontractors' excavation,
plaintiff removed 38,977.33 cubic yards of
excavation and was required to expend.....$179,043.54
Credit to subcontractors for
38.977.33 cubic yards at 56¢ per
cubic yard .........................$21,827.30
Subcontractors removed 599,422.64
cubic yards at 56¢ per cubic yard.. 335,676.68
Total amount earned by and
credited to the subcontractors...$357,503.98
Less payments made to the sub-
contractors ........................ 270,784.13
Total credits and payments ................. 86,719.85
Due to plaintiff .............................. $92,323.69
Less credit for applying water .............. 856.00
Balance due to plaintiff ..................... $91,467.69
```

We do not agree with plaintiff's method of computation but we first must discuss a number of its elements. We will leave to later the question of plaintiff's costs. We will first discuss how much of plaintiff's costs are chargeable to the subcontractor.

■ One fact is clear, the defendants did not complete their contract. Plaintiff's survey shows that prior to the state extending the payment lines 23,935 cubic yards of excavation still had to be done, and plaintiff so advised defendants by letter dated January 10, 1955.

It is true that defendants' engineer, Grasso, made an independent survey on four days two winter months after plaintiff's survey was made and shows a much larger number of cubic yards excavated. But we reject it as improvidently made and not supported by substantial evidence. In fact Grasso's estimate (and incidentally it was only an estimate) gives the subcontractor credit for more than the state paid even after the change in payment lines.

One of the most cogent pieces of evidence in the case was the surety agent's inspection report. Although he was a lawyer and not an engineer his report fairly summarizes the sloppy, incompetent and haphazard excavating of the subcontractor. Their principal fault was the disregard of the need to maintain their ditches so as to take the overflow of surface water.

In defendants' brief after trial they accept the state's final payment figure of 638,399 cubic yards as the total excavation and now claim 636,914 cubic yards of this excavation as properly attributable to defendants' work. Another fact of importance in analyzing defendants' work is the fact that they submitted none of their own records and two of the defendants never testified.

■ Accepting as we do plaintiff's testimony and evidence with regard to the amount of excavation necessary to complete the contract and rejecting defendants', we find that defendants had excavated 599,422.64 cubic yards including the 7,080.64 cubic yards that they had overcut. Undoubtedly the subcontractor should be paid for this excavating at the rate of 56¢ a cubic yard, which totals $335,676.68. The subcontractor before suit had been paid $270,784.13, leaving a balance due and owing to the subcontractor of $64,892.55. Against this balance of $64,892.55 plaintiff is entitled to charge, pursuant to the terms of its contract, its costs for completing the job. In order to complete the job plaintiff had to excavate 38,977.33 cubic yards, but this was to complete the job up to the new state payment lines. In order to complete the job left undone by the subcontractor plaintiff had to do the difference in excavation from what the subcontractor had already done, 599,422.64 and 616,277 (the original payment lines) or a total of 16,854.36 cubic yards. Under the contract it is entitled to be reimbursed for its costs.

As we said above, plaintiff purportedly kept a record of its costs (Exhibit 22) and this shows that it expended $179,-043.54. Although plaintiff argues that this is the amount of money it expended to excavate 38,977.33 cubic yards it is not entitled, as we just said, to reimbursement for those yards since they include yardage that was not in the original subcontract but yardage that was extended by the state. However, using its cost figures it appears by a matter of simple division that the cost per cubic yard is $4.59 or $77,361.51 for 16,854.36 cubic yards.

Plaintiff also introduced expert testimony as to the reasonable value of this type of work and it was that expert's opinion that $4.78 per cubic yard was a fair and reasonable cost. At first blush we find it hard to assess damages at the rate of $4.59 a cubic yard when we are dealing with a contractor who did the same type of work and agreed, at arm's length, to do it for 56¢ a cubic yard. Although we hesitate to use the higher figure we are compelled by reason of the terms of the contract. It is not a question of what was the fair and reasonable value of the extra excavation but the cost to plaintiff, for the contract specifically provided in the event of the subcontractor's default that "the Contractor shall be at liberty to provide such labor, materials and equipment as it may deem proper, and to deduct the cost thereof from any money then due or thereafter to become due the Subcontractor under this agreement."

This brings us to plaintiff's records of its costs (Exhibit 22) which are bitterly attacked by both defendants with rather loose and vehement charges of fraud and deception, to say nothing of inaccuracies. While it is possible after the event to studiously examine and card expense vouchers it is quite a different matter of proof to show that they are fraudulent, substituted and fictitious. We are satisfied that while there might have been some puffing there was no proof of fraud, deception or substitution. Defendants, particularly the surety, rely to a very large extent on the records kept by an engineer who acted as inspector for the State Thruway Authority. Such engineer was not called as a witness but his records were introduced and the defendants assume that the court should accept them with the same reverence as Holy Writ is commonly accepted. We do not know of any rule of law that so requires. It is true that in a great many places in the engineer's report it shows the plaintiff working at stations other than the stations involved in the contract area and employed different equipment and employees. It is also true that defendants have shown that on a number of occasions a mechanic was charged when the machines were idle and not broken down and that the foreman, Sanchez, was not working according to the inspector's report when plaintiff's records show that he was.

We have reviewed this entire problem and are satisfied that plaintiff's records are substantially correct and that defendants have not shown that they are fraudulent or deceptive.

Plaintiff, in its brief, is willing to concede that 24 days of a mechanic's pay be taken away from the mechanic's charges or a total of $567, and that all of Sanchez's salary, $480, be eliminated, which comes to a total of $1,047. Plaintiff is entitled to be reimbursed for its costs in removing 16,854.36 cubic yards at the rate of $4.59 per cubic yard for a total of $77,361.51, less $1,047, or $76,-314.51. Against this should be deducted $64,892.55 concededly owing to the subcontractor, leaving a balance of $11,-421.96, for which it should have judgment against all defendants with interest from August 11, 1955.

This disposition resolves the issues raised under defendants' first counterclaim and it is accordingly dismissed.

The subcontractor's second counterclaim at trial is for $160,830.19 damages sustained as a result of being forced to make a long haul to a far fill area as a result of plaintiff's violation of the terms of the subcontract. This claim is

predicated on a clause in the contract that provides that the subcontractor's excavations were to be "moved westerly to the closest fills until all excavations had been placed in embankments in proper order" and another clause requiring the contractor to "coordinate and perform all co-related work so that they will not interfere with or delay operations of the subcontractor."

It is alleged in defendants' pleading that plaintiff failed to remove all the "muck" it was obligated to remove from the closest westerly fill, thereby causing the longer haul, and that plaintiff utilized the two closest fills for excavating work it was doing in another area. This claim on trial was extended to a breach of an alleged oral agreement antedating the contract and was to the effect that plaintiff's president agreed that the fill was to be placed in the two fill areas closest westerly to the cuts. Although we permitted such testimony in evidence relating thereto we find it unconvincing.

Exhibit 6, a cross-section map prepared by the state, Santaniello (defendants' manager) admitted he saw prior to signing the contract and admitted that it showed the estimated quantities of excavation for each cut and the estimated quantities of embankment for each fill. This exhibit very clearly shows that between stations 328–373 the estimated excavation was 610,600 cubic yards and that the estimated embankment for the two adjacent westerly fills was 442,364 cubic yards including a small fill area between stations 338 and 341. It follows that the subcontractor's Santaniello knew that the closest westerly fills were not large enough to hold their estimated 610,600 cubic yards of excavation. The other prong to the subcontractor's claim relates to the failure of plaintiff to remove all the muck it was required to remove. If it had, it argues, there would have been sufficient space in the three closest fill areas to contain the subcontractor's entire excavation.

We find, however, that muck had to be removed from the fill areas before any excavation could be placed in such areas

and that "embankment" includes estimated muck. Even defendants' engineer, Grasso, conceded this. It follows that the two closest westerly fills were not large enough to take the subcontractor's excavation and accordingly the subcontractor's claim of an oral agreement along the lines previously indicated is considerably weakened, if not proved to be non-existent.

In addition it was conclusively established that more muck was removed by plaintiff than the Thruway originally estimated. Even with the increased amount of muck removed (47,566 cubic yards) the subcontractor still had to have some 130,000 cubic yards brought to another fill area, i. e., between stations 256 and 268. But even assuming that the oral agreement was in fact made and assuming muck formed no part of embankment yardage and assuming further that because of plaintiff's breach in not moving enough muck, and assuming the truth of Santaniello's testimony relating to the conversation with Defelice during the course of excavating to the effect that Defelice said he would pay the book figures for the overhaul and the non-relevancy of the terms of the contract which specifically excludes payment for overhaul, defendant has utterly failed in its burden to adequately prove its damages.

As a factual issue defendants submitted no proof of the cost for any overhaul. The most they offered was a compilation from the inspector's reports (none from their own records) of the total cost of all different types of equipment plus an expert's opinion as to the rental cost of such equipment and necessary labor for a sum total of $160,830.19. This is not proof of the additional cost of overhaul. It seems to us that the proof should have been directed to the additional cost of hauling material for so many feet or so many miles. Defendants' brief (p. 37 et seq.) all but concedes this failure. Accordingly, the second counterclaim at trial is dismissed.

Defendants' third counterclaim at trial is for extra work in the sum

of $480,906.01 (in the brief after trial this has been reduced to $69,101.78). Its claim is that plaintiff failed to remove "unsuitable material" and requested the subcontractor to remove it and at the same time agreed to pay the subcontractor the fair and reasonable value thereof. At and after trial this claim has been changed so that the claim is that plaintiff breached its contract in not excavating the unsuitable material and required defendant to do it, but whether it was to be paid pursuant to a direct promise or quantum meruit is not clear. The whole claim in whatever form is bottomed on the definition of "unsuitable material." Defendant claims that such term was intended to include wet material found while excavating since its equipment was not suitable for removing such material. The most flattering description of this claim is that it is "ingenious."

The term "unsuitable material" is defined in the contract but the subcontractor argues that the definition there is not precise and the term is ambiguous. Therefore, parol evidence was admitted to prove its meaning. Since we tried the case without a jury and have a nodding acquaintance with the confusion engendered by the so-called Parol Evidence Rules (cf. Farmer v. Arabian American Oil Company, 2 Cir., 277 F.2d 46, decided April 6, 1960), we received all evidence that was proffered wondering from time to time of the wisdom of any rule of evidence.

According to the subcontractor the definition of "unsuitable material" came into being on a bright Sunday morning before the contract was signed when Santaniello and Defelice discussed the proposed contract. It was Santaniello's recollection that he told Defelice that his equipment could only handle dry material and that 56¢ a cubic yard would be fair only if the material was dry, and if it was wet he could not take the job. To this Defelice replied that it was only dry material and that Santaniello's equipment was competent to handle such dry

material. Accordingly, armed with such a precise definition, he signed the contract later that week and when he saw in the contract that Defelice was going to remove unsuitable material and not he, he was satisfied. His recollection varied a few times while testifying. At one point he said Defelice told him the state would pay for the unsuitable material, and later that Defelice would pay him costs plus 15%. Still later it was at a rate of something more (how much more was not disclosed) than 56¢ a cubic yard, and finally that Defelice would pay the expenses and give Santaniello a profit. Parenthetically, it should be added that defendant's equipment, according to its witnesses, was capable of moving wet material. In fact it was so capable that it moved and was paid for 383,317 yards by August 10, 1954, and claimed an additional 156,683 yards or a total of 540,000 yards excavated by August 10, 1954. The fact that we admitted the evidence is quite a different matter than the problem of its credibility or its trustworthiness. As to the latter, we do not believe it and specifically reject it as unworthy of belief.

But assuming that there was such a conversation and a pre-contract definition and that the contract definition was ambiguous, plaintiff's claim is not much further advanced. Defendant kept no records (or at least offered none in evidence) so its proof as to what was wet and what was not had to necessarily be vague. Its engineer estimated that 391,898 cubic yards were wet. This in turn was on the assumption that water was encountered eight feet below the original contour of the ground in stations 354 to 373. Accepting this estimate of wet or unsuitable material that defendant was required to excavate and the promise that plaintiff agreed to pay the extra cost of removal, defendants have utterly failed to prove what the extra costs were. With the extra equipment they rented from others and plaintiff, defendant was able to excavate and move substantial quantities. But what the extra costs were, i. e., the difference between what

they had and what they had to get was never proved.

Not only did defendant fail to prove its extra costs but it did not prove what materials were wet or how a court could satisfy itself as to what was wet or dry. There was no evidence describing what percentage of moisture was necessary to make it come within the definition. Surprisingly enough with all of this lesson in semantics the Thruway Authority accepted the wet or, as defendants say, the unsuitable material that it deposited in the fill areas and not only accepted it but paid for it. It should be added that whatever material was wet was brought about by the incompetent manner in which the subcontractor performed the work. As the chief engineer of the Thruway testified, defendant failed to maintain ditches and as a result any rain would cause the cut to be saturated. Defendants' Exhibits BB and CC, compilations made, we are sure, on the evening before they were introduced and received with hesitation at the time of the trial, hardly measure up to the proof required and are rejected as not persuasive. Accordingly, S & B's third counterclaim at trial is dismissed.

Since we have dismissed defendants' counterclaims without reference to the numbered counterclaims in S & B's answer, and since certain numbered counterclaims were withdrawn at or after trial, let it now suffice to say that all counterclaims are dismissed and plaintiff is granted judgment thereon.

Plaintiff is, therefore, entitled to judgment against all defendants in the sum of $113,237.40 with interest as indicated herein.

This memorandum is filed in lieu of findings of fact and conclusions of law.

### Supplemental Opinion

Our memorandum-decision of July 20, 1960, is amended as follows:

The damages awarded to plaintiff on its first cause of action should be in the amount of $30,518.50 instead of $11,421.96, and its total damages on all its causes of action accordingly increased to $132,333.94 with interest as originally indicated.

This amendment to the amount of damages on plaintiff's first cause of action is occasioned by our error in reducing the 23,935 cubic yards necessarily excavated by plaintiff within the original payment lines by 7,080.64 cubic yards overcut by defendants S & B beyond the original payment lines. In short, plaintiff is entitled to be reimbursed for the full 23,935 cubic yards at the rate of $4.59 a cubic yard.

Accordingly, the second paragraph on page 11 is hereby amended to read: "Plaintiff is entitled to be reimbursed for its costs in removing 23,935 cubic yards at the rate of $4.59 per cubic yard for a total of $109,861.65, less $1,047, or $108,814.65. Against this should be deducted $78,296.15, which sum is arrived at as follows: $60,927.39 concededly owing to the subcontractor; $13,403.60, credit to the subcontractor for 23,935 cubic yards at 56¢ a cubic yard, and $3,965.16, credit to the subcontractor for 7,080.64 cubic yards at 56¢ a cubic yard, leaving a balance of $30,518.50, for which it should have judgment against all defendants with interest from August 11, 1955."

Defendant Globe Indemnity Co. is entitled to a judgment-over in the sum of $132,333.94 on its cross-claim against the other defendants because of the Indemnity Agreement executed by them.

Our memorandum-decision of July 20, 1960, is further amended by substituting the word "defendants'" for the word "plaintiff's" on the third line from the bottom on page 15.