Merrimack,
No. 5900.

PETER SALVUCCI & SONS, INC. *v.* STATE.

February 27, 1970.

*Devine, Millimet, McDonough, Stahl & Branch* and *Robert A. Backus* ( *Mr. Joseph A. Millimet* orally ), for the plaintiff.

*Alexander J. Kalinski*, special counsel ( by brief and orally ), for the State.

LAMPRON, J.  Action by plaintiff under RSA 491:8 to recover damages from the State for a breach of contract involving the construction of a part of Interstate Route 93 in Franconia. Trial before a Master ( *Charles J. Flynn, Esq.* ). A view of the different sites involved was taken on July 5, 1966. Evidence was presented before the master on various days between July 11 and September 23, 1966.  The master's report included 60 specific findings and rulings made after a consideration of plaintiff's 113 requests for findings and rulings and of 31 such requests submitted by the defendant.  The parties also filed memoranda of law and written arguments.  The master's recommendation that the plaintiff be awarded the sum of $111,114.41 was accepted by the Superior Court ( *Bownes*, J. ) and judgment for plaintiff entered in that amount plus interest and costs in accordance with a motion by plaintiff.

Defendant excepted to the denial of its motion to dismiss made at the end of plaintiff's case and at the close of all the evidence. Defendant also excepted to the denial of its motions to set aside the master's report and for a continuance of plaintiff's motion for judgment on the report until the transcript of the evidence was available to the defendant. These exceptions were reserved and transferred by the Superior Court.

On January 13, 1958, Peter Salvucci and Sons, Inc., a Massachusetts corporation, entered into a contract with the State of

New Hampshire, for the bid price of $837,267.63, to construct 7200 feet of highway in the town of Franconia running from Station 1 to Station 72. This project ( P-3293-A ) will be referred to as "Job A" or "Job I." On April 29, 1958, the same parties entered into an agreement for the construction of 10,600 feet of highway adjoining the former and running from Stations 72 to 178. This project ( P-3293-B ) will be called "Job B" or "Job 2." The completion date for both of these projects was October 15, 1959.

The essentials of plaintiff's claims are that in soliciting the bids for Job A the State represented to it that the work could be performed with materials obtained by widening the slopes of the highways; that free gravel and borrow could be obtained from the National Forest lands through which the highways were to be built; that the only cost to the contractor would be the cost of replanting the areas from which such materials were taken at a cost of approximately $50 per acre.

Plaintiff alleged "that when [it] undertook to do the work in the manner represented to it by THE STATE, it was denied the right to widen the slopes, and was denied the right to obtain free gravel and borrow from the National Forest Land, so that it had to obtain large quantities of gravel and borrow from other locations.

"THE STATE'S failure to make free gravel and borrow available, as represented, not only required that the Plaintiff purchase large quantities of material, which it was entitled to receive without charge, but also put the Plaintiff to great additional expense for the cost of digging and hauling the same, instead of being able to construct the projects as anticipated, by the use of much more economical machinery and equipment."

The plaintiff further alleged that the State, subsequent to the awarding of these two contracts, reaffirmed its promise to make free borrow and gravel available to the plaintiff in quantities and qualities sufficient to satisfy the 340,000 cubic yards required to perform Job A at places and times necessary for its performance.

The plaintiff alleged that as a result of the breach of its contract by the State, both in its original misrepresentations and in its subsequent promises, it was put to great additional expense and suffered severe damages in its performance, not only of Job A,

but also of Job B. These breaches it is alleged caused the plaintiff direct extra expenses in the amount of $225,726.23 and also overall intangible inefficiencies on both jobs which together resulted in a net overall loss to the plaintiff of $454,614.93.

The master made the following findings:

" 1. The plaintiff Salvucci obtained its first road construction contract from the Highway Department in 1949 and worked almost continuously in New Hampshire from 1954 until the completion of Job A on October 20, 1959. During this period, the plaintiff did a considerable amount of road work for the State and built about 35-40 miles of roads in New Hampshire. The plaintiff was, in general, familiar with the policies, practices, and procedures of the Highway Department applying to road construction jobs and the handling of the clauses that appear in highway construction contracts.

" 2. On or about December 2, 1957, the State advertised for bids for the construction of a hot asphaltic concrete highway section . . . [Job A] . . . a portion of which passed through the White Mountain National Forest . . . . This was the first time that either the plaintiff or the defendant had been involved in the construction of a section of such a major highway through a portion of the White Mountain National Forest. A peculiar characteristic of the construction of this road was that it involved a considerable amount of more earth moving in the way of excavation and fill than is usually involved in the ordinary high-way job.

" 3. As the Highway Department usually puts out a 6 month projection of pending projects, the plaintiff was aware of this Franconia job a few months prior to the advertising of bids on December 2, 1957. The plaintiff's president, Peter Salvucci, had visited the site in question in October and November of 1957. On these occasions, he walked, where feasible, over the area where the road was to be constructed and looked over the area for material to do the job. There was no snow on the ground.

" 4. After December 2, 1957, when the Highway Department sent out invitations to bid on Job A, the plaintiff obtained copies of the plans, profiles, test borings and soils data applicable to this job.

" 5. With a view to making a bid on Job A, the plaintiff's key personnel . . . inspected the job site around the middle of

December 1957. At this time, there was some snow on the ground. Although they could not walk the base line of the road, these men, all experienced road builders, could get within a hundred feet or so of it and had a good idea as to the center line from observing stakes. Peter Salvucci, who had previously toured this job area, showed his brother, Ralph, [vice-president and general superintendent], and Eugene Kalafarski [plaintiff's project engineer] the general layout and indicated where material might be obtained. Louis Thompson [plaintiff's superintendent] who lived in the area, was also quite familiar with the job locale. Ralph scaled off an area between Stations 10-40 . . . and satisfied himself that there was sufficient material in this area in quantity to do Job A if the material were available.

" 6.   After the aforesaid inspection, Ralph Salvucci had Eugene Kalafarski, who was an experienced engineer and knew what was needed in the way of material for this job, check ( sic ) on the boring and soils data of the Highway Department. Based on the information given to him by Mr. Kalafarski, and after studying the Plans, the Materials Report and Soils Profile, and after a discussion with Mr. Kalafarski and Louis Thompson, Ralph became satisfied that the material for Job A, if available, was present in quality, as well as in quantity, both from the standpoint of borrow and gravel, in an area between Stations 10 and 40 in the National Forest land.

. . . .

" 8.   The plaintiff was familiar with the General Specifications . . . and the special provisions of the Invitation to bid on Job A . . . , including the Materials Report. Embodied in the Invitation to Bid . . . in the section containing the National Forest Special Provisions were the following paragraphs . . . :

'Materials necessary for the completion of the project will be obtained, if available, by widening slopes.

'No borrow pit shall be opened up within or outside the right of way to secure materials needed for the construction of the highway, nor shall any excavation be done beyond the work limits as definitely located by the plans, except as additional permission is granted by the Forest Supervisor.'

" 9.   There appeared to be a conflict between the above two paragraphs. The first paragraph, which was in accord with the

practice in prior jobs, stated that materials could be obtained, if available, by widening slopes. The second paragraph, which was peculiar to this White Mountain National Forest job, appeared to be somewhat contradictory. The first paragraph indicated that materials could be obtained, if available, by widening the slopes, whereas the second paragraph stated that no borrow pit shall be opened up within or outside the right of way nor shall any excavation be done beyond the work limits as located by the plans except as additional permission is granted by the Forest Supervisor.

"10. On December 30, 1957, in the pre-bid period, John Palazzi, . . . one of the prospective bidders on Job A, went to the Highway Department for the purpose of trying to resolve what appeared to him to be an ambiguity or conflict between the foregoing two paragraphs. He wanted to find out if material could be obtained from the National Forest land and, if so, the cost thereof. At the time of Mr. Palazzi's visit to the Highway Department . . . nobody was able to supply him with the information desired . . . . Mr. Palazzi spoke with Nicholas J. Cricenti, Assistant Construction Engineer in the Highway Department, . . . . [who] had Stanton C. Otis . . . an engineer in charge of the Right-of-Way-Division, telephone the National Forest office in Laconia. He spoke with a Mr. Kelly who stated that there would be no charge for the material, and this information was given to Mr. Palazzi."

Generally the State does not contest that there was testimony to support the foregoing quoted findings of the master. It maintains, however, that certain inferences drawn and conclusions arrived at by the master were erroneous and unwarranted.

After an examination of the voluminous testimony and of the many exhibits introduced, we have arrived at the following conclusions. Peter Salvucci's testimony concerning his familiarity with the "Standard Specifications for Road and Bridge Construction", a 390 page manual issued by the Highway Department; his further testimony pertaining to his knowledge from experience of the State's practice as to widening of slopes or enlarging of pits adjoining the Highway; the testimony of Ralph Salvucci, general superintendent in charge of construction, pertaining to his familiarity with that practice and with the specifications

pertaining to these jobs; warranted the inferences made by the master relative to plaintiff's familiarity with "the policies, practices, and procedures" of the Highway Department.

The master's characterization of Job A as being peculiar in the considerable amount of earth moving and fill involved, objected to by the State, was warranted by elements of the two contracts involved here and by other testimony in the record. The contract for Job A involved 222,000 cubic yards of earth borrow as compared to 62,000 for Job B. This consists of fill brought from outside sources, and was considered by the plaintiff to be of first importance in the bidding.

There was sufficient support in the evidence for the master's finding, excepted to by the State, that Ralph Salvucci became satisfied that the material for Job A, if available, was present in quality, as well as in quantity, both from the standpoint of borrow and gravel, in an area between Stations 10 and 40 in the National Forest. The materials report, dated December 5, 1957 furnished to bidders by the State read in part as follows: "Deposit #2. A very large pit containing sandy fine to medium gravel is located between the Butter Hill Road on the north and Route #3 on the east. Material from this deposit has been used on previous recent construction on Route #3." This deposit was in the above area and contained Pits J and K and was situated on National Forest land. The above materials report together with a Soils Report furnished by the State, the observations, knowledge and experience of plaintiff's key personnel which appear in the record warranted the master's finding.

We do not agree with the State's contention that the master's finding that there was a conflict between the two sections in the National Forest Special Provisions, hereinbefore quoted, "is not supportable and to the extent that it is a ruling of law, it is manifestly erroneous." There was evidence that "widening of a cut slope would be an opening of the borrow pit." The Trial Court could properly find and rule that the first of these two paragraphs seemed to indicate that materials necessary for the completion of the project could be obtained, if available, by widening the slopes. However, as this would be considered opening a borrow pit the second paragraph seemed to forbid such obtention of materials "except as additional permission is granted by the Forest Supervisor." In other words the Trial Court could properly

find and rule that an ambiguity existed as to whether material could be obtained on National Forest land by widening the slopes with permission of the State, which was the usual practice, or whether this was forbidden unless permission from the Forest Supervisor was also obtained. *See* 4 Williston, Contracts (3d *ed.*) *ss.* 609-609B. The master could properly find that Mr. Palazzi was also uncertain in this area from his inquiry at the Highway Department. "I wanted to know the cost of materials that we might get from the National Forest property and the conditions."

The master made these further findings:

"11. The Highway Department then sent out to all bidders on December 30, 1957, the telegram that is set forth below pertaining to Job A. This telegram was received by the plaintiff [3 days before the bidding closed] and it has been agreed by counsel that it was duly authorized. The telegram read as follows:

"IN RE: FRANCONIA PROJECT I 002-3(2) [Job A]. FREE GRAVEL AND BORROW MAY BE OBTAINED FROM NATIONAL FOREST LAND. AREAS MUST BE REPLANTED. COST $50.00 PER ACRE.

JOHN O. MORTON,
COMMISSIONER

"12. Up to the time of the receipt of this telegram, the plaintiff was not sure how and where it was going to get its material. This telegram, as far as the plaintiff was concerned, resolved any ambiguities or conflicts that existed in the aforesaid paragraphs in the National Forest Special Provisions. The plaintiff interpreted this telegram to mean: (1) if borrow and gravel were in fact available in the ground in the National Forest, such material would be made available free of charge to the successful bidder on Job A; (2) the Highway Department had obtained the necessary permission of the Forest Supervisor to open up borrow pits within or outside the right of way and to perform excavation beyond the work limits as definitely located by the plans; and (3) materials necessary for the completion of the project could be obtained, if available, by widening slopes in a manner satisfactory to the state engineer in accordance with prior practice and custom. This interpretation by the plaintiff was reasonable under the conditions and circumstances."

The master also found and ruled that the State's telegram

constituted positive and material representations which it should have reasonably understood the bidders would rely on and prepare their bids accordingly. The master further found and ruled that plaintiff did in fact reasonably rely on these representations in submitting its bid thus planning on the use of scrapers as the most efficient and economic method of performing the work. The master also found that if plaintiff had known that it would not be permitted to widen slopes and procure its material from the National Forest land its bid would have been higher.

The State admits in its brief that plaintiff's witnesses testified that they so interpreted the telegram. John Palazzi, whose firm was a bidder for Job A and the recipient of such a telegram, called by the State, answered in part the following question: "Q. How much material did you expect to get out of National Forest Land if you were the low bidder on this project? A. . . . . If the material were available, and everybody was agreeable, I would expect . . . to get it all if it were there." Another witness called by the State, Louis Thompson, plaintiff's superintendent in charge of Job A, testified in part as follows: "They [plaintiff] did come up and show me the telegram and said they were going to be able — by the looks of this telegram, kind of gives us permission to go on the government land and get the material, and that was as I believe they interpreted it, and I did, but there was no guarantee what types of material would be in there."

The State maintains, however, that in the light of all the provisions of the contract document itself and of the "Standard Specifications for Road and Bridge Construction" which govern it, the telegram could not legally be interpreted as the plaintiff did and as the master found and ruled. It further contends that plaintiff's reliance upon this telegram, "if in fact it did so, was a unilateral mistake on its part and formed no basis for a claim against the State."

It is not contested that the telegram which was made a part of the contract documents, became an integral part of the legal obligations of the parties. The law is well established "that the proper interpretation of a contract is that which will make it speak the intention of the parties at the time it was made". *Griswold* v. *Heat Corporation*, 108 N. H. 119, 123, 229 A. 2d 183. This is equally true in ascertaining the meaning of the telegram in question. *Paisner* v. *Renaud*, 102 N. H. 27, 29, 149 A. 2d

867. "It follows that in construing the written agreement of these parties, all of its provisions, its subject matter, the situation of the parties at the time, and the object intended to be effected will be considered in arriving at the sense of the words they used." *Griswold* v. *Heat Corporation, supra*; *Rivier College* v. *St. Paul Fire Ins. Co.*, 104 N. H. 398, 402, 187 A. 2d 799; *Smith* v. *Furbish*, 68 N. H. 123, 129, 44 A. 398; 17 Am. Jur. 2d, Contracts, *s.* 258.

The invitation for bids on Job A was dated December 2, 1957 and submissions were due January 2, 1958. The telegram in question bore the date December 30, 1957. A provision of the "Proposal Contract Bond and Special Provisions for Construction" pertaining to this project contained the following provision entitled "*Special Attention.*" It read as follows: "Bidders are strongly urged to investigate all Special Provisions in this Proposal, giving particular study to those bearing recent dates, since revisions may be included herewith which may call for significant changes in bid prices from those which may have been included in former projects." We are of the opinion that the telegram comes within this provision.

We hold that this telegram was subject to the interpretation placed on it by the plaintiff because of the findable ambiguity in the National Forest provisions contained in the contract; the inquiry made of the Highway Department concerning the cost and conditions upon which materials located in Forest land could be obtained; the wording of the telegram itself; the time when and the circumstances under which it was issued; the evidence of the prevailing practice of permitting materials to be obtained by widening of the slopes; and the testimony that it is advantageous to both the contractor and the State to obtain materials on or near the job project. We further hold that the master properly found and ruled, that the telegram constituted a positive and material representation by the State to bidders, such as plaintiff, that, if present on Forest land, the materials required for the performance on Job A could be obtained free and by widening the slopes with permission of the State engineer. *Griswold* v. *Heat Corporation*, 108 N. H. 119, 123, 229 A. 2d 183; *John Arborio, Inc.* v. *State*, 245 N. Y. S. 2d 274, 277.

The State contends that certain provisions in the contract militate against this interpretation. It points to the following

language in the Materials Report issued by the State under date of December 5, 1957 and made a part of the contract. "The following is supplied for the Contractor's information. The quantity and quality of the deposits and the possibility of purchase from the property owners are not guaranteed by the Department." The State relies also on the following language of section 2.05 of the "Standard Specifications": "It will be assumed that the Bidder has also investigated and is satisfied with the sources of supply for all materials."

In further support of its contention, the State relies on section 6.05 of these same "Specifications" which reads in part as follows: "The Contractor shall not open or enlarge gravel or borrow pits adjoining highways except upon written permission of the Engineer." The State relies also on the statement in the National Forest specifications in the contract that no borrow pit shall be opened within or outside the right of way to secure materials "except as additional permission is granted by the Forest Supervisor."

The State admits in its brief that the master could properly find on the evidence that it had been a common practice in the construction of roads in New Hampshire to obtain borrow by widening the slopes with permission of the State engineer. We have already held that this known practice and the above provision in the Forest specifications were properly found and ruled to create an ambiguity. There was also evidence that dealings with the Forest Service were to be made through the State.

The above factors, plus the positive wording of the telegram signed by the Highway Commissioner: "Free Gravel and Borrow May Be Obtained From National Forest Land"; and the date on which it was issued; lead us to hold that the telegram did not require, nor provide, the time for additional or independent verification by the plaintiff of this specific representation pertaining to the availability of materials and superseded any general exculpatory provision in the contract or specifications. "Where a bidder is allowed insufficient time within which to make a personal study, the State cannot invoke the general exculpatory clauses to exonerate itself from liability. Particularly is this true in a case . . . where no specific warning is given in connection with the particular item the representation of which is in question; or in a situation . . . where the bidder has not time to make a personal

and detailed inspection." *John Arborio, Inc.* v. *State*, 245 N. Y. S. 2d 274, 278; *Hollerbach* v. *United States*, 233 U. S. 165, 172, 58 L. Ed. 898, 34 S. Ct. 553; *Maney* v. *Oklahoma City*, 150 Okla. 77, 82, 300 P. 642; *Pennsylvania Turnpike Commission* v. *Smith*, 350 Pa. 355, 361, 39 A. 2d 139; *United States* v. *Johnson*, 153 F. 2d 846 ( 9th Cir. 1946 ); *Morrison-Knudsen Company* v. *United States*, 397 F. 2d 826, 841 ( Ct. Cl. 1968 ); *Wunderlich* v. *State of California*, 65 Cal. 2d 777, 782, 423 P. 2d 545; 43 Am. Jur., Public Works and Contracts, *s.* 111, *pp.* 852, 853. *See Thomsen-Abbott Construction Co.* v. *City of Wausau*, 9 Wis. 2d 225, 234, 100 N. W. 2d 921.

It is a basic rule of contract law that one who has contracted to do a thing for a stated price will not be entitled to extra compensation on account of encountering difficulties which have not been provided against in the contract. *Leavitt* v. *Dover*, 67 N. H. 94, 32 A. 156; Simpson, Contracts, *s.* 180 ( 1965 ); Restatement Contracts, *s.* 467. Nevertheless, "A contract for public works unqualified in its terms may be justly interpreted as qualified in fact where it does not fairly appear that the contractor undertook to construct the improvement without regard to the correctness of representations [made by the other party] as to conditions to be encountered." 43 Am. Jur. Public Works and Contracts, *s.* 111, p. 852. *Hollerbach* v. *United States,* 233 U. S. 165, 172, 58 L. Ed. 898, 34 S. Ct. 553; *Souza & McCue Const. Co.* v. *Superior Court of San Benito,* 57 Cal. 2d. 508, 510, 370 P. 2d 338. *See* Annot. 76 A. L. R. 268. Thus, "A contractor of public works who, acting reasonably is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being other than as represented." *Wunderlich* v. *State of California*, 65 Cal. 2d 777, 782, 423 P. 2d 545; *Haggart Construction Co.* v. *State Highway Com'n.*, 427 P. 2d 686 ( Mont. 1967 ); *J. G. Watts Construction Company* v. *United States*, 355 F. 2d 573 ( Ct. Cl. 1966 ).

The crucial question in such a situation is that of justified reliance by the contractor on the representations made by the State. *Haggart Construction Company* v. *State Highway Com'n, supra* 688. It would serve no useful purpose to rehearse the

ambiguity which existed and served as a context in which the telegram was to be interpreted; the language of the telegram itself; its effect on other provisions of the contract; and the meaning which prospective bidders, such as the plaintiff, could attach to it. Nor do we have to detail the evidence in the record which warranted a finding that the materials required to complete Job A were in fact present adjacent to the job in National Forest land, and were not made available to the plaintiff. We hold that the master properly found and ruled that "the plaintiff reasonably relied upon the representation contained in the aforesaid telegram in submitting its bid." *Souza & McCue Constr. Co.* v. *Superior Court,* 57 Cal. 2d 508, 510, 370 P. 2d 338; *United States* v. *Johnson,* 153 F. 2d 846, 849 ( 9th Cir. 1946 ). *See Wunderlich* v. *State of California, supra,* 783, 423 P. 2d 545; Annot. 76 A. L. R. 268.

The master also properly ruled that "the failure of the Highway Department to make said material available to the plaintiff free of charge from the National Forest Land constituted a breach of a positive and material representation in the contract, and the plaintiff is entitled to recover such damages as it may have suffered by such breach." *Grant Construction Co.* v. *Burns,* 92 Idaho 408, 443 P. 2d 1005; *Department of Highways of La.* v. *Morse Bros. & Assoc.,* 211 F. 2d 140 ( 5th Cir. 1954 ).

We also hold that the master properly ruled that section 9.03 of the "Standard Specifications" has no application to plaintiff's claim. This section deals with disputed claims for extra compensation "for work or materials not clearly covered in the contract or not ordered as extra work." Interpreted in conjuction with sections 1.16, 4.03, 4.04, 5.09 and 9.04 of the same Specifications, it is apparent that section 9.03 pertains to changes made by the parties during the progress of the work, whether in scope, extent or design, and sets up certain procedural steps to be complied with in regard to payment therefor. When, as in this case, the master could properly find and rule that plaintiff's claim was based on a breach of contract, that is, a failure to comply with certain representations made and relied on, such a provision does not apply. 43 Am. Jur., Public Works and Contracts *s.* 112, *p.* 855. See *Francoeur* v. *State,* 102 N. H. 339, 157 A. 2d 49; *Merrill Engineering Co.* v. *United States,* 47 F. 2d 932 ( D. C.

Miss. 1931 ); *Yonkers Contracting Co.* v. *Maine Turnpike Authority*, 208 F. Supp. 517 ( D. C. Maine 1962 ).

In general terms the basis of plaintiff's claim for damages is that had it been free to obtain its materials from the National Forest, as it reasonably believed it would be, the cost of performing Job A and Job B would have been substantially less than the cost actually incurred. Job B which adjoined Job A to the north, was bid by the plaintiff on or about April 10, 1958, and it was awarded the contract April 29, 1958. This extra cost resulted from the extra expense of obtaining the necessary materials to complete Job A, and also Job B because of the required use of materials therefrom on Job A. The claimed extra cost also resulted from inefficiencies caused by the necessity to use scrapers, adopted to obtain material along side the job, for longer hauls, not their best use, and because plaintiff was unable to manage the job as efficiently as it could have otherwise, particularly in the use of select materials, such as gravel.

The master found that after having been awarded the contract for Job A, January 13, 1958, the plaintiff entered into "lease and/or lease purchase" contracts covering 4 tractor drawn scrapers and 3 rubber tired self-propelled scrapers to be utilized on this project. During the period between the latter part of January and the middle of April, there was considerable discussion between the plaintiff and the State about the method of obtaining materials for this job. Plaintiff's project engineer and an assistant engineer of the Highway Department prepared a plan for widening the slopes between Stations 26 and 38 which would have provided about 340,000 cubic yards. of borrow and ordinary gravel for the performance of Job A. This plan was rejected by the State, not due to any objection over widening the slopes, but because of the resulting steep slopes.

Plaintiff with the assistance of the Highway Department then prepared a second plan which would have provided about 321,000 cubic yards of such material. This plan, accepted by the State, was rejected by National Forest "who would not allow either the plaintiff or the State to widen the slopes as both the plaintiff and the defendant had been assuming could be done . . .. Contrary to its expectations, the Highway Department was thereafter unable to get permission from the Forestry Department to

widen the slopes and instead, as a substitute, was only able to obtain . . . use permits . . . for certain pits . . . . By this time, the plaintiff had made definite plans as to the manner in which this job was going to be performed [with scrapers] and had arranged to acquire the equipment . . . ''

The first use permit, obtained June 5, 1958, covered three pit areas J, K, and G. The latter had ledge in it and was hard to work so plaintiff could not use it. Another permit was obtained June 30 for pit H. "None of these permits allowed the plaintiff to obtain materials by widening the slopes as had been originally intended by the plaintiff and the Highway Department." "The plaintiff was only able to have about 8 days of full operations in pits J and K" and only obtained therefrom 24,818 and 85,023 cyds. of borrow. "There was gravel in pits J and K, but the plaintiff, due to the immediate and pressing need for borrow, had to use same for borrow and was unable to segregate and stock-pile same." Plaintiff worked pit H from June 30 until about July 17, 1958 when it had to stop because the materials from it became unsatisfactory. Plaintiff obtained 38,592 cyds. of borrow from this pit. In summary plaintiff obtained 156,467 cubic yards of the 219,786 yards of borrow required for Job A from Forest pits J, K and H.

The master found that "when materials were exhausted from the National Forest pits, production was considerably reduced. In order to keep the job going, substantial quantities of materials had to be obtained and hauled from Job B and the Chalet Call pits", outside pits. Plaintiff hauled materials from Job B, with the tacit approval of the Highway Department, from June 5, 1958, and by agreement after July 18. It thus obtained the balance of the required earth borrow as follows: 50,683 cyds. from Job B; 12,636 from outside sources and 27,532 from widening slopes.

Besides the above earth borrow, the master found that of the 40,366 cyds. of sand borrow used on Job A, 20,868 cyds. were hauled from Job B.

The master also found that of the 44,403 cyds. of gravel necessary to perform Job A, 12,651 came from Job B, and 31,752 from outside pits. There was evidence from material and soil reports and from actual experience with Pit L on Job B, and the master could properly find that the 340,000 cyds. of material adjacent to Stations 10 to 40 on Job A would have produced sufficient gravel to meet these requirements.

As to the 27,626 cyds. of crushed gravel required for Job A, plaintiff abandoned its claim that material suitable to produce crushed gravel was available adjacent to that job. There was evidence, however, and the master found that the best supply of such material in the vicinity of Job A was in the Trudeau Road Pit in the National Forest. The plaintiff asked for, but was denied permission by Forest Service to use it. The master found that if this pit had been made available it would have provided all the crushed gravel required for Job A. The only claim made by plaintiff thereafter was for the cost, and extra hauling expense, of gravel obtained from other pits.

Plaintiff's claim for excess overtime wages amounting to $39,206.24 caused by lost time and delays in operations as well as $6,437.63 for insurance and taxes was disallowed by the master. This issue is not before us.

The State maintained that the moving of materials from Job B to Job A was done by the plaintiff solely for its own convenience and was caused in great measure by delays which it encountered on Job B not due to any fault of the State. The master did not adopt this contention and we hold his action was warranted by the record. The master found that in the spring and through the summer of 1958, the plaintiff on many occasions complained and protested to the Highway Department representatives concerning the lack of materials for Job A and kept making pressing requests of it about the National Forest matter being ironed out. The plaintiff was assured by the Department on several occasions during this period that it would straighten out this matter and that it would keep ahead of the plaintiff so it would have the materials when needed.

The master also found that on August 14, 1958, plaintiff wrote a letter to the defendant complaining about time loss, the lack of materials, excessive hauls and additional purchase cost of materials and requesting the Department to re-examine the situation. A representative of the Highway Department replied on November 26, 1958 and stated that the factors mentioned in plaintiff's letter appeared to be involved and would require more time for a proper evaluation and suggested that a meeting be arranged during the winter. "The defendant's letter made no mention that the plaintiff's difficulties were of its own doing as subsequently alleged at the trial." Subsequent thereto meetings between plaintiff and the Department took place in Concord in January and March of

1959 "at which times the plaintiff again set forth its grievances. The position of the Highway Department in substance was that any decision should await the final outcome of the work on Jobs A and B to see if the plaintiff would in fact be hurt." Highway Department representatives were present on these jobs and were making reports to the main office in Concord. It is difficult to reconcile the above action of the Department with the claim that plaintiff was hauling materials from Job B to Job A for its own convenience.

We now consider the method by which the master arrived at the different items of damages totaling $111,114.41. As hereinbefore stated the master found and ruled that the failure of the Highway Department to make material available to the plaintiff free of charge from the Forest land constituted a breach of contract. The master also found and ruled that the result of this breach was to "add additional expense to the plaintiff in performance of Jobs A and B . . . . " These additional expenses consisted mainly in the cost of materials purchased and in the extra cost of hauling such materials as well as materials obtained from Job B.

The quantities of materials used by the master in assessing damages were those provided by the State in its final estimate of materials used on these jobs. These were considerably less in many instances than the quantities used by the plaintiff in its specifications. The sources of these materials, used by the master, are not seriously disputed. The cost of material purchased was established by testimony and by documentary evidence.

The amount of labor and equipment used to haul all of these materials was obtained from daily reports made as the jobs progressed, which were introduced in evidence. An analysis made therefrom itemizing every piece of equipment and every man working on these two jobs day by day was tabulated and also introduced in evidence.

To arrive at the cost of hauling these materials the plaintiff employed a tripartite formula, the details of which were fully explored at the trial. The first element was the rental value of the equipment used. This element was obtained by the use of an 84 page pamphlet entitled "Computation of Rental Rates for Construction Equipment" prepared by "Associated Equipment Distributors," commonly known as the "Green Book" which plaintiff

testified was a generally accepted authority in the trade. Plaintiff did not use the higher daily rate but the lower monthly rate and computed the daily rate therefrom which produced a rate which was 41% of the given daily rate. The second element was the cost of maintaining this equipment. This figure derived from a recognized trade source was 12%. The third element was the cost of labor, derived from plaintiff's payroll, 12% to which 2% was added for insurance and taxes making a total of 14%. The overall cost of hauling thus arrived at was 67% of the "Green Book" daily rates. This was the basis used by the master to compute the cost of hauling materials in assessing damages.

Using this factor of 67%, the cost of hauling materials from government or Forest land to Job A was established to be 33.3 cents per cubic yard. The cost of hauling materials from Job B to Job A was 90.6 cents and from non-government or outside sources to Job A and Job B was 97.3 cents per cubic yard. Comparing the cost of hauling material from government pits adjacent to Job A with the cost of hauling materials from more distant points, the excess cost of hauling from the latter was established to be as follows: hauling from Job B to Job A $90.6 - 33.3 = 57.3$ cents but 57 cents was used; hauling from outside sources to Job A and B $97.3 - 33.3 = 64$ cents. These costs were used by the master in computing the extra hauling charges for all materials involved except crushed gravel on which there is a customary overhaul charge of 10 cents per mile after two miles. In this case the master found that the excess hauling for crushed gravel was 3 miles and computed the extra hauling at 30 cents per cubic yard.

Applying these figures to the quantities of materials, previously detailed herein, to purchase and to haul, which the master found defendant's breach of contract caused plaintiff extra expense the master arrived at the following amounts: earth borrow $40,142.30; sand borrow $20,683.21; gravel $39,625.26; crushed gravel $10,663.64 for a total of $111,114.41.

Defendant takes the position that the plaintiff offered only evidence of a calculated or computed loss based on estimates, and not an actual loss. In other words defendant maintains that plaintiff never showed by any actual financial records of the company that it in fact sustained a real financial loss on these two projects, nor did it show in any real sense that, in fact, there

were extra expenses incurred on these two projects. This argument is directed particularly at the use of the formula to determine the hauling expenses.

"It is a well-established rule of law that in awarding compensatory damages for breach of contract, 'the effort is made to put the injured party in as good a position as that in which he would have been put by full performance of the contract . . . ." *Coos Lumber Co.* v. *Builders Supply Co.*, 104 N. H. 404, 406, 188 A. 2d 330. Determination of damages for breach of a contract is an inexact science and the sum reached by whatever method used will often be no more than an approximation. The law does not require mathematical certainty. *Grand Trunk Western R. Co.* v. *W. Nelson Co.*, 116 F. 2d 823, 838 ( 6th Cir. 1941 ); *Dale Construction Co.* v. *United States*, 168 Ct. Cl. 692, 729 ( 1964 ); *J. G. Watts Construction Co.* v. *United States*, 355 F. 2d 573, 581 ( Ct. Cl. 1966 ); *W. L. Hailey & Company* v. *County of Niagara*, 388 F. 2d 746, 753 ( 2d Cir. 1967 ); 22 Am. Jur. 2d, Damages, *s.* 25; Restatement, Contracts, *s.* 331, *comment* a. The use of a formula, as was done in this case, can be an acceptable method of proving damages. *W. L. Hailey & Company* v. *County of Niagara, supra*, 754; *Grand Trunk Western R. Co.* v. *H. W. Nelson Co., supra*. The fact that part of the elements of damages were based on an abstract or summary from voluminous records of the plaintiff made available to the defendant is proper. *R. S. Willard Co.* v. *Columbia Van Lines Mov. & Stor. Co.*, 253 A. 2d 454, 456 ( D. C. C. A. 1969 ); *L. G. Defelice & Son* v. *Globe Indemnity Co.*, 189 F. Supp. 455, 460 ( D. C. N. Y. 1960 ).

During the trial the master had before him not only the plaintiff's daily reports on the job, showing the labor force and equipment on the job and the amount of materials moved, but also plaintiff's analysis thereof, defendant's criticism in writing and plaintiff's rebuttal thereof. There was evidence from Ralph Salvucci that if hauling costs were computed by using plaintiff's actual payroll figures applied to the particular work and equipment cost based on book value less depreciation instead of the formula adopted by the master "It would be pretty close to being the same." On the evidence the master could find that the formula used based in part on recognized method of evaluating cost of equipment and on plaintiff's payroll represented a legitimate scale

of values by which plaintiff's loss could be measured. *W. L. Hailey & Company* v. *County of Niagara*, 388 F. 2d 746, 753, (2d Cir. 1967). There was also other evidence which tended to corroborate the amount of damage claimed by plaintiff.

Without attempting to detail further the evidence in support of the damages found by the master, we hold that proof of the items constituting the same which were taken up in detail met the requirements of certainty which can be expected under the circumstances.

The defendant argues in its brief that the testimony of Ralph and Peter Salvucci was entitled "to very little credibility." The main events in this case took place between October 1957 and October 1959. Most of the documentary evidence introduced by plaintiff to support its claims was tabulated in 1960 from daily reports made while these jobs were being performed. Job A involved a bid of $837,267.63 and Job B one of $858,822.08. The testimony of plaintiff's bookkeeper for 10 years, including those involved here, was unavailable, he having died before the trial took place in 1966. The master saw and heard these witnesses in the environment of the hearing and the view of the premises. It is to be assumed that in making his findings on conflicting evidence, the master assessed the credibility of these witnesses and gave their testimony the weight it merited. *Dube* v. *Bickford*, 92 N. H. 362, 31 A. 2d 64. We find no basis in the record to set aside any finding of the master on the ground of lack of credibility alleged by the State or on any other ground. *Ballou* v. *Ballou*, 95 N. H. 105, 58 A. 2d 311; *Brown* v. *Teel*, 108 N. H. 365, 366, 236 A. 2d 699; *Barton* v. *Plaistead*, 109 N. H. 428, 256 A. 2d 642. We hold that defendant's motions to dismiss made at the end of plaintiff's case and at the close of all the evidence were properly denied by the master and defendant's exceptions thereto are overruled.

Defendant filed a motion that the hearing upon its motion to set aside the master's report and upon plaintiff's motion for judgment on the report be continued until the transcript was made available. Defendant's exceptions to the denial of this motion and to the granting of plaintiff's motion for judgment were reserved and transferred by the Superior Court.

Rule 64 (RSA 491: App. R. 64) of the Superior Court provides in part as follows: "In cases tried by the Court without jury or

by a master or referee, the oral proceedings of the trial shall not be transcribed by the stenographer in advance of verdict or decree unless the Court rules that justice so requires . . . ." The parties were advised by the master early in the hearing that no provision had been made for transcription of the evidence.

It is not unusual for a Trial Court to transfer without ruling questions raised in a case heard by a master. *Sonabend* v. *Charron*, 86 N. H. 386, 169 A. 589. The need or importance of a ruling by the Trial Court is not present in this case since he had not heard or seen the witnesses. *Eichel* v. *Payeur*, 107 N. H. 194, 196, 219 A. 2d 287; *Richards* v. *Crocker*, 108 N. H. 377, 236 A. 2d 692. Furthermore a requirement that all master's reports should be approved by the Superior Court, especially only after transcription of the evidence, would cause unreasonable delays in the final disposition of such cases and would violate the spirit, if not the letter, of Rule 64. We find no abuse of discretion or irregularity in the action of the Superior Court and defendant's exceptions thereto are overruled.

There is no basis in the record to set aside the findings or rulings of the master, and the order is

*Judgment on the verdict.*

All concurred.